FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ERIC BATES; BERT ENOS;
BABARANTI OLOYEDE; ERIC
BUMBALA; EDWARD WILLIAMS, on
behalf of themselves and all others
similarly situated,
                    *Plaintiffs-Appellees,*

            v.

UNITED PARCEL SERVICE, INC., dba
UPS,
                    *Defendant-Appellant.*

No. 04-17295

D.C. No.
CV-99-02216-TEH

OPINION

Appeal from the United States District Court
for the Northern District of California
Thelton E. Henderson, Senior District Judge, Presiding

Argued and Submitted
June 20, 2007—San Francisco, California

Filed December 28, 2007

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
Stephen Reinhardt, Pamela Ann Rymer,
Michael Daly Hawkins, Sidney R. Thomas,
Barry G. Silverman, M. Margaret McKeown,
Raymond C. Fisher, Ronald M. Gould, Richard A. Paez,
Marsha S. Berzon, Richard R. Clifton, Milan D. Smith, Jr.,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge McKeown;
Partial Concurrence and Partial Dissent by Judge Berzon

16883

## COUNSEL

Mark A. Perry (argued), Gibson, Dunn & Crutcher, LLP, Washington, D.C., Christopher J. Martin, Gibson Dunn & Crutcher, LLP, Palo Alto, California, Rachel S. Brass and Amanda M. Rose, Gibson, Dunn & Crutcher, LLP, San Francisco, California, for the defendant-appellant.

Laurence W. Paradis (argued) and Kevin M. Knestrick, Disability Rights Advocates, Berkeley, California, Todd M. Schneider and Guy B. Wallace, Schneider & Wallace, San Francisco, California, for the plaintiffs-appellees.

James L. Lee, Carolyn L. Wheeler, Vincent J. Blackwood and Barbara L. Sloan (argued), Equal Employment Opportunity Commission, Washington, D.C., for amicus curiae Equal Employment Opportunity Commission.

Claudia Center and Lewis Bossing, The Legal Aid Society-Employment Law Center, San Francisco, California, for amici curiae American Association of People with Disabilities et al.

Rae T. Vann, McGuiness Norris & Williams, LLP, Washington, D.C., for amicus curiae Equal Employment Advisory Council.

Robin S. Conrad and Shane Brennan, National Chamber Litigation Center, Inc., for amicus curiae Chamber of Commerce of the United States of America.

Robert Digges, Jr., American Trucking Associations, Inc., Alexandria, Virginia, J. Brett Busby and Jeffrey L. Oldham, Mayer, Brown, Rowe & Maw LLP, Houston, Texas, for amicus curiae American Trucking Associations, Inc.

**OPINION**

McKEOWN, Circuit Judge:

This appeal under the Americans with Disabilities Act (ADA) requires us to consider the intersection of a safety-based qualification standard and the "business necessity" defense. United Parcel Service (UPS) imposes a Department of Transportation (DOT) hearing standard on all package-car drivers, even though the DOT standard is federally mandated only for higher-weight vehicles. A class of hearing-impaired UPS employees and applicants who cannot meet the DOT hearing requirement challenges UPS's policy under Title I of the ADA, 42 U.S.C. §§ 12101-12213, the California Fair Employment and Housing Act (FEHA), Cal. Gov't Code §§ 12900-12996, and the Unruh Civil Rights Act (Unruh Act), Cal. Civ. Code § 51.[1]

Bates accepts, as he must, that UPS may lawfully exclude individuals who fail the DOT test from positions that would require them to drive DOT-regulated vehicles, i.e., vehicles exceeding a gross vehicle weight rating (GVWR) of 10,000 pounds. *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 570 (1999). Bates contends, however, that UPS may not lawfully exclude hearing-impaired individuals from consideration for positions that involve vehicles whose GVWR is less than 10,001 pounds.

After a bench trial on liability, the district court found UPS liable on all of Bates's claims, enjoined UPS from using the blanket qualification standard, and required individualized assessment of candidates for the package-car driver positions. The court founded its analysis on the pattern-or-practice burden-shifting framework of *International Brotherhood of*

---

[1]The original lead plaintiff, Eric Bates, passed the DOT physical examination, including the hearing standard, after the nationwide class was certified. For ease of reference, we refer to the class as "Bates."

*Teamsters v. United States*, 431 U.S. 324 (1977). In determining whether UPS met its asserted "business necessity" defense, the district court looked to our earlier decision involving hearing-impaired UPS drivers, *Morton v. United Parcel Service, Inc.*, 272 F.3d 1249 (9th Cir. 2001). *Morton* imported into its ADA analysis concepts from both the traditional Title VII business necessity defense to disparate impact claims and the "bona fide occupational qualification" (BFOQ) standard from Title VII disparate treatment challenges to a proscribed classification.

We granted rehearing en banc to consider the contours of a claim that an employer's safety qualification standard discriminates against otherwise "qualified" persons with disabilities, *see* 42 U.S.C. § 12112(a), (b)(6), and the showing required of an employer to successfully assert the business necessity defense to use of such qualification under 42 U.S.C. § 12113(a). Because this case involves a facially discriminatory qualification standard, we conclude that the *Teamsters*' burden-shifting protocol is inapplicable. In addition, we overrule *Morton* to the extent that it imposes a BFOQ standard under the ADA, as the plain language of the ADA does not support such a construction. Because the district court considered this case under the framework of *Teamsters* and *Morton*, we vacate and remand for further proceedings. We do not consider the merits of the FEHA claim because the pertinent FEHA law has changed since the district court issued its decision. Finally, following our decision in *Bass v. County of Butte*, 458 F.3d 978 (9th Cir. 2006), we reverse the district court's finding that UPS violated the Unruh Act.

## BACKGROUND

### UPS AND PACKAGE-CAR DRIVERS

UPS package-car drivers deliver and pick up packages for UPS in the familiar brown UPS trucks. UPS employs more

than 320,000 employees in the United States, over 70,000 of whom are package-car drivers.

When an opening for a driving position becomes available, UPS contacts the individual in that UPS center with the highest seniority who has bid on such a position.[2] If that person is not interested, UPS moves down the list in descending seniority order until it finds an interested employee. The applicant must satisfy several requirements, which vary from district to district, but generally include (1) having completed an application; (2) being at least twenty-one years of age; (3) possessing a valid driver's license; and (4) having a "clean" driving record. Once the seniority threshold and other prerequisites to employment are met, all applicants for a package-car driver position must pass both UPS's road test and the DOT physical examination required of drivers of commercial vehicles over 10,000 pounds. UPS has a policy of hiring only drivers who can satisfy DOT standards.

At issue in this appeal is the hearing standard that is part of the DOT physical. An individual satisfies the DOT hearing standard if he

> [f]irst perceives a forced whispered voice in the better ear at not less than 5 feet with or without the use of a hearing aid or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard (formerly ASA Standard) Z24.5-1951.

49 C.F.R. § 391.41(b)(11). According to the district court, the

---

[2]UPS is divided into sixty-one districts, each of which includes various package delivery "centers" covering different geographical areas.

forced-whispered standard requires that potential drivers not only hear the sounds made but understand the words spoken.

Unlike UPS, which requires drivers of all package cars to pass the DOT physical, the DOT imposes this standard only for those driving vehicles with a GVWR of at least 10,001 pounds. *See* 49 U.S.C. § 31132(1)(A); 49 C.F.R. § 391.41. A "gross vehicle weight rating" is the actual weight of the vehicle plus any cargo capacity. As of October 2003, UPS's fleet contained 65,198 vehicles, of which 5,902 vehicles had a GVWR of less than 10,001 pounds. The GVWR of the lighter vehicles ranged from 7,160 to 9,318 pounds, with the majority of these vehicles weighing 8,600 pounds. By way of comparison, automobiles, which include passenger cars, sport utility vehicles, light trucks and minivans, average 3,240 pounds.[3]

## PROCEEDINGS IN THE DISTRICT COURT

In November 2001, the district court certified a nationwide federal class on the ADA claim that includes "[t]hose persons throughout the United States who (i) have been employed by and/or applied for employment with [UPS] at any time since June 25, 1997, up through the conclusion of this action, (ii) use sign language as a primary means of communication due to a hearing loss or limitation, and (iii) allege that their rights have been violated under Title I of the ADA on account of [UPS's] policies and procedures."[4] The federal class was certified under Federal Rule of Civil Procedure 23(b)(2) to seek primarily injunctive and declaratory relief. As part of its post-trial findings and conclusions, the district court modified the composition of the class on the "driving issue" to include "only those individuals who failed or would fail the DOT hearing test." *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order [cer-

---

[3]David A. Buckingham, U.S. Geo. Survey, Steel Stocks in Use in Automobiles in the United States 1 (2006).

[4]The district court also certified a subclass of California plaintiffs on the state law claims.

tifying an action as a "class action"] under Rule 23(c)(1) may be altered or amended before final judgment.").

Phase one of the bifurcated bench trial was conducted over several weeks in the spring and fall of 2003. At the close of Bates's evidence, UPS moved pursuant to Federal Rule of Civil Procedure 52(c) for judgment on partial findings. UPS argued that its invocation of the DOT hearing standard is lawful because Bates failed to show that (1) any class member meets the DOT standard and thus failed to show that any class member satisfies the essential functions of the job, or (2) that any reasonable accommodation exists that would permit class members to pass the DOT hearing test. In the alternative, UPS moved to decertify the class pursuant to Federal Rule of Civil Procedure 23(c)(1) and (d), contending that Bates failed to show that there is an adequate class representative, or proposed substitute, who is otherwise qualified for a UPS package-car driver position or has been injured by UPS's use of the qualification standard.

Following phase one of the trial, the district court issued detailed findings of fact and conclusions of law. The district court found that Bates satisfied his prima facie case based upon a combination of two factors: first, UPS's policy operated as a blanket exclusion of deaf individuals, and second, at least one named plaintiff, Babaranti Oloyede, and at least one class member, Elias Habib, were "qualified" individuals with a disability with standing to sue under the ADA by virtue of having satisfied all prerequisites for the driving position other than the DOT hearing requirement. The court further concluded that Bates did not have the burden to establish at that stage that any plaintiffs were "qualified" in the sense that they were capable of driving safely. Accordingly, the district court denied UPS's motions for judgment under Rule 52(c) and to decertify the class.

Critical to its ruling, the district court next found that, under *Morton*, UPS failed to satisfy its burden under the business

necessity defense. Thus, the court reasoned, UPS's categorical exclusion of individuals who do not meet the DOT hearing requirement violates the ADA (and, accordingly, the FEHA and the Unruh Act as well). The district court entered an injunction requiring UPS to "cease using the DOT hearing standard to screen applicants for package-car driver positions" with respect to vehicles weighing 10,000 pounds or less and to "perform an individualized assessment" of applicants that meet the threshold qualifications, other than the hearing standard. Upon UPS's motion, the district court stayed all further proceedings pending UPS's interlocutory appeal.

## ANALYSIS

### I. JURISDICTION

UPS's interlocutory appeal of the order granting a permanent injunction falls squarely within the scope of 28 U.S.C. § 1292(a)(1), which grants us jurisdiction over "[i]nterlocutory orders of the district courts . . . granting . . . injunctions." Our review of the permanent injunction properly includes review of the merits of the district court's determination of liability. *Smith v. Vulcan Iron Works*, 165 U.S. 518, 525 (1897); *e.g.*, *Long v. Bureau of Economic Analysis*, 646 F.2d 1310, 1317-18 (9th Cir. 1981) (per curiam), *vacated on other grounds*, 454 U.S. 934 (1981). Review is particularly appropriate in cases like this one, in which the appeal is taken from a permanent, rather than preliminary, injunction, and "[t]he district court has completed its consideration of the liability issue, retaining jurisdiction only for an accounting of damages." *Marathon Oil Co. v. United States*, 807 F.2d 759, 764 (9th Cir. 1986).

We likewise have jurisdiction to consider the district court's denial of UPS's Rule 52(c) motion for judgment on partial findings or, in the alternative, for class decertification under Rule 23(c)(1) and (d), because the district court's determinations as to both motions are inextricably intertwined with

the permanent injunction. *Paige v. California*, 102 F.3d 1035, 1039-40 (9th Cir. 1996) (reviewing class certification order under § 1292(a)(1) because order was "inextricably intertwined" with permanent injunction granting class-wide relief); *Marathon Oil*, 807 F.2d at 764-65 (reviewing summary judgment and partial dismissal under § 1292(a)(1) where orders were "inextricably bound up" with findings and conclusions in support of permanent injunction).

## II.  ARTICLE III STANDING

The district court did not grapple with the Article III standing issue, apparently because UPS did not raise a standing challenge below but instead framed its challenge as one to Bates's failure to prove his prima facie case. Standing is a threshold matter central to our subject matter jurisdiction. We must assure ourselves that the constitutional standing requirements are satisfied before proceeding to the merits. *United States v. Hays*, 515 U.S. 737, 742 (1995); *Casey v. Lewis*, 4 F.3d 1516, 1524 (9th Cir. 1993).

**[1]** In a class action, standing is satisfied if at least one named plaintiff meets the requirements. *See Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001). The plaintiff class bears the burden of showing that the Article III standing requirements are met. *See id.* at 860-61. As we know from the oft-repeated passages in *Lujan*, standing requires that (1) the plaintiff suffered an injury in fact, i.e., one that is sufficiently "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) the injury is "fairly traceable" to the challenged conduct, and (3) the injury is "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotation marks and citations omitted). Standing must be shown with respect to each form of relief sought, whether it be injunctive relief, damages or civil penalties. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). Here, only liability and equitable relief were at issue in the

district court, not damages. Thus, we consider only whether at least one named plaintiff satisfies the standing requirements for injunctive relief.

**[2]** The standing formulation for a plaintiff seeking prospective injunctive relief is simply one implementation of *Lujan*'s requirements. The plaintiff must demonstrate that he has suffered or is threatened with a "concrete and particularized" legal harm, *Lujan*, 504 U.S. at 560, coupled with "a sufficient likelihood that he will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). As to the second inquiry, he must establish a "real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). "[P]ast wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy." *Lyons*, 461 U.S. at 103. However, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea*, 414 U.S. at 496. In addition, the claimed threat of injury must be likely to be redressed by the prospective injunctive relief. *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1003 (9th Cir. 1998) (recognizing that "[p]laintiffs need not demonstrate that there is a 'guarantee' that their injuries will be redressed by a favorable decision" but "only that a favorable decision is *likely* to redress" their injuries) (quotation marks and citation omitted).

Although the district court did not make explicit findings on standing, it made detailed findings on relevant and analogous issues sufficient to support standing. "[W]e will affirm standing . . . unless those findings are clearly erroneous." *Armstrong*, 275 F.3d at 861. Based on the district court's findings regarding named plaintiff Barbaranti Oloyede, we conclude that he and class member Elias Habib satisfy the standing requirements with respect to injunctive relief.

As a general matter, the class includes only those individuals who failed or would fail the DOT hearing test. Oloyede

worked for UPS beginning in 1991, first applied for a package-car driver position in 1998, and expressed interest in that position several additional times, most recently in 2003. His supervisor told him in 2000 that he would have to pass a hearing exam to become a driver. Oloyede was not hired as a package-car driver.

**[3]** Both aspects of the injury requirement are met in this case. First, UPS's failure to hire Oloyede as a package-car driver was a sufficiently "concrete and particularized" harm, in that the injury affected him "in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. Second, the crux of this lawsuit is the challenge to UPS's written qualification standard, including the DOT hearing standard. Where, as here, "the harm alleged is directly traceable to a written policy . . . there is an implicit likelihood of its repetition in the immediate future." *Armstrong*, 275 F.3d at 861; *see also Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004).

**[4]** The causation element of standing is easily satisfied. Oloyede's claimed injury—failure to hire him as a package-car driver because of a hearing disability—was caused and will continue to be caused by UPS's application of the DOT hearing standard. *See, e.g.*, *Mortensen v. County of Sacramento*, 368 F.3d 1082, 1086 (9th Cir. 2004) (holding that plaintiff showed there was a "significant possibility" that he would suffer future injury based upon county's written policy regarding compensatory time off, where the policy had been applied to him in the past and remained in place).

Finally, we turn to the issue of redressability. After certification of the class in 2001, Oloyede accepted a position at UPS which, due to the terms of a collective bargaining agreement, precludes him from presently bidding for a package-car driver position. UPS argues that because Oloyede cannot now bid for a package-car driver slot, he could never be a "qualified" applicant who would benefit from an injunction. This argument is a backhanded way of attacking Oloyede's stand-

ing as a named plaintiff and suggesting that his claim is moot. Indeed, mootness is described as "the doctrine of standing set in a time frame." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (quoting Henry P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 YALE L.J. 1363, 1384 (1973)).

Even if UPS is correct that Oloyede's claim is either not redressable or is moot because he is no longer in a driver-eligible position, questions we do not decide, the remaining class members are not foreclosed from attaining relief since the class was long ago duly certified. The Supreme Court has acknowledged that "there is tension in [its] prior cases" with respect to standing and adequacy in the class action context. *Gratz v. Bollinger*, 539 U.S. 244, 263 n.15 (2003). The same tension exists with respect to standing and mootness in class actions. *Id. See also* Jean Wegman Burns, *Standing and Mootness in Class Actions: A Search for Consistency*, 22 U.C.D.L. REV. 1239 (1989). Nonetheless, even amidst these tensions, as in *Gratz*, "whether the requirement is deemed one of adequacy or standing [or mootness], it is clearly satisfied in this case." *Gratz*, 539 U.S. at 263. *See E. Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 406 n.12 (1977) (noting that it would be error for a district court to dismiss class allegations where it had already certified a class and "only later had it appeared that the named plaintiffs were not class members or were otherwise inappropriate class representatives.").

As the Court reasoned in *Sosna v. Iowa*, once a class action has been certified, "the class of unnamed persons described in the certification acquire[s] a legal status separate from the representative." *Sosna v. Iowa*, 419 U.S. 393, 399 (1975). *Sosna* involved a class action challenging the constitutionality of a state statute imposing a one-year residency requirement for instituting a divorce action. *Id.* at 397. At the time of the district court judgment, plaintiff had not yet met the residency requirement. *Id.* at 398. By the time the case reached the Supreme Court, however, plaintiff had not only met the resi-

dency requirement but also obtained a divorce in another state. *Id.* at 398 & n.7. With regard to mootness, the Supreme Court held that the "cases or controversies" requirement of Article III— which requires a plaintiff with a live case or controversy, not only at the time of filing and at the time of class certification, but also when a court reviews the case—is satisfied by "a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot." *Id.* at 402. As one commentator put it, "[w]hat saved *Sosna* from being moot was class certification." Burns, 22 U.C.D.L. REV. at 1248.

The following year the Court clarified *Sosna* in *Franks v. Bowman Transportation Company*, 424 U.S. 747 (1976), which involved a class action against an employer for racially discriminatory employment practices. Although the named representative no longer had a personal stake in the outcome because he had been hired and properly discharged for cause, the Court held that "[t]he unnamed members of the class involved are identifiable individuals, individually named in the record," and "[n]o questions are raised concerning the continuing desire of any of these class members for the seniority relief presently in issue." *Id.* at 756.

The Court cited *Franks* just one year later in *East Texas Motor Freight* and observed that if "the initial certification was proper and decertification not appropriate, the claims of the class members would not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims." 431 U.S. at 406 n.12.

[5] These cases are instructive in analyzing class standing in this appeal. It is not disputed that Oloyede had standing at the time of certification, which is the snapshot in time for determining initial standing. Even if his claim later became moot or nonredressable, an identifiable member of the class, Elias Habib, surely has standing. According to the district

court, Habib, who is completely deaf, has a valid driver's license and twenty-seven years of driving experience. The district court also found no evidence that he had been involved in any accidents. Other than the DOT physical, which Habib failed because of his hearing loss, there was no other qualification standard that prevented him from applying for the job. He accordingly satisfies the injury, causation, and redressability prongs of *Lujan* and therefore has standing to seek injunctive relief under the ADA. Because Habib has standing to seek injunctive relief, the entire federal class has standing. *Armstrong*, 275 F.3d at 860-61.

## III. LEGAL FRAMEWORK APPLICABLE TO A "QUALIFICATION STANDARD" CLAIM UNDER THE ADA

### A. INITIAL CONSIDERATIONS

[6] The hearing standard at issue here is a *facially discriminatory* qualification standard because it focuses directly on an individual's disabling or potentially disabling condition. *See, e.g.*, *McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999) (holding that a policy requiring employees to be "100% healed" or "fully healed" after an injury is facially discriminatory and constitutes a *per se* violation of the ADA). Instead of recognizing this posture, the district court analyzed the claim as a "pattern-or-practice" disparate treatment claim, applying the burden-shifting protocol set out in *Teamsters*. *See* 431 U.S. at 360.

[7] A burden-shifting protocol is, however, unnecessary in this circumstance. The fact to be uncovered by such a protocol—whether the employer made an employment decision on a proscribed basis (here, disability in the form of hearing impairment)—is not in dispute. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1182-83 (6th Cir. 1996) (noting that when a defendant admits to taking account of disability status, the burden-shifting framework sometimes applicable to disparate treatment claims is unnecessary).

**[8]** In addition, whether Bates established a prima facie case of employment discrimination in the summary judgment "burden-shifting" sense is moot after trial. The relevant inquiry now is simply whether the evidence presented at trial supports a finding of liability. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855-56 (9th Cir. 2002) (en banc), *aff'd*, 539 U.S. 90 (2003).

## B.   APPLICABLE PROVISIONS OF THE ADA

**[9]** The enforcement provision of Title I of the ADA, under which Bates brought suit, provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Thus, under the ADA, an employee bears the ultimate burden of proving that he is (1) disabled under the Act, (2) a "qualified individual with a disability," and (3) discriminated against "because of" the disability. *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999).

There is no dispute that the class members, who are hearing impaired, are disabled. Instead, we focus on the two other key terms in the statute: "qualified individual" and "discriminate." To unpack the meaning of these terms, we look to the statute.

**[10]** A "qualified individual" is "an individual with a disability who, *with or without reasonable accommodation*, can perform the *essential functions* of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8)

(emphasis added); *see also* 29 C.F.R. § 1630.2(m). "Essential functions" are "fundamental job duties of the employment position . . . not includ[ing] the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1); *see Cripe v. City of San Jose*, 261 F.3d 877, 887 (9th Cir. 2001). "If a disabled person cannot perform a job's 'essential functions' (even with a reasonable accommodation), then the ADA's employment protections do not apply." *Cripe*, 261 F.3d at 884-85. "If, on the other hand, a person can perform a job's essential functions, and therefore is a qualified individual, then the ADA prohibits discrimination" with respect to the employment actions outlined in 42 U.S.C. § 12112(a). *Id.*

[11] Discrimination under the ADA includes the use of "*qualification standards*, employment tests or other selection criteria that screen out or *tend to screen out* an individual with a disability or a *class of individuals with disabilities* unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6) (emphasis added).[5] The EEOC regulations define "qualifications standards" as "the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q).

[12] In a case involving the use of a qualification standard, the ADA provides employers with a "business necessity" defense:

---

[5]In the First Amended Complaint, Bates alleged that UPS's hearing standard constituted discrimination under § 12112(b)(6), set out above, and under § 12112(b)(3), which defines discrimination to include "utilizing standards, criteria, or methods of administration [ ] that have the effect of discrimination on the basis of disability." 42 U.S.C. § 12112(b)(3)(A). The district court, and the parties on appeal, focused only on § 12112(b)(6).

> It may be a defense to a charge of discrimination under this chapter that an *alleged application of qualification standards*, *tests, or selection criteria* that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be *job-related and consistent with business necessity*, and such performance *cannot be accomplished by reasonable accommodation*, as required under this subchapter.

42 U.S.C. § 12113(a) (emphasis added).

Where an across-the-board safety "qualification standard" is invoked, the question then becomes what proof is required with respect to being a "qualified individual," that is, one who can perform the job's essential functions. Before an employee can challenge an employer's qualification standard, however, an employee must first prove that he is a "qualified individual" within the meaning of the ADA, that is, one who can perform the job's essential functions with or without reasonable accommodation. Bates argues that he meets all of the essential functions of the package-car driver position, including being a "safe" driver. Although Bates acknowledges that class members do not meet the DOT hearing standard, he contends that hearing is not an essential function, and thus there are qualified individuals who meet UPS's other job requirements.

UPS, on the other hand, urges that class members are not qualified individuals because they cannot meet UPS's requirement that all drivers pass the DOT hearing standard, and thus cannot meet an essential function of the job—DOT certification to drive all commercial vehicles. UPS also argues that each class member is required to show not only that he is a "safe" driver in the sense that he has a "clean driving record," but also that he is a safe driver *despite being hearing impaired*.

We turn first to the qualified individual inquiry and then to the question of discrimination.

### C.   QUALIFIED INDIVIDUAL WITH A DISABILITY

As the plaintiff, Bates bears the burden to prove that he is "qualified." *See Nunes*, 164 F.3d at 1246; *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996). Qualification for a position is a two-step inquiry. The court first examines whether the individual satisfies the "requisite skill, experience, education and other job-related requirements" of the position. The court then considers whether the individual "can perform the essential functions of such position" with or without a reasonable accommodation. 29 C.F.R. § 1630.2(m); 42 U.S.C. § 12111(8); *see Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1135 (9th Cir. 2001); *see also EEOC v. Convergys Customer Management Group, Inc.*, 491 F.3d 790, 794-95 (8th Cir. 2007); *Branham v. Snow*, 392 F.3d 896, 904 (7th Cir. 2004).

### 1.   JOB REQUISITES

**[13]** The package-car driver job requires an applicant to meet UPS's threshold seniority requirements for the package-car driver position, complete an application, be at least twenty-one years of age, possess a valid driver's license, and have a clean driving record by UPS's local standards. The district court's finding that named plaintiff Oloyede and class member Elias Habib meet these prerequisites is not clearly erroneous.

### 2.   ESSENTIAL FUNCTIONS

To prove that he is "qualified," the applicant also must show that he can perform the "essential functions" of the job. 42 U.S.C. § 12111(8). *See Nunes*, 164 F.3d at 1246; *Kennedy*, 90 F.3d at 1481. As noted earlier, a job's "essential functions" are "fundamental job duties of the employment position . . . not includ[ing] the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1); *see also id*. § 1630.2(n)(2)-(3) (elaborating on reasons and evidence relevant to an essential func-

tion showing). "Essential functions" are not to be confused with "qualification standards," which an employer may establish for a certain position. Whereas "essential functions" are basic "duties," 29 C.F.R. § 1630.2(n)(1), "qualification standards" are "personal and professional attributes" that may include "physical, medical [and] safety" requirements. *Id.* § 1630.2(q). The difference is crucial.

The statute does not require that a person meet each of an employer's established "qualification standards," however, to show that he is "qualified." And, indeed, it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly *cannot* meet because of his disability and that forms the very basis of his discrimination challenge.[6]

**[14]** Although the plaintiff bears the ultimate burden of persuading the fact finder that he can perform the job's essential functions, we agree with the Eighth Circuit's approach that "an employer who disputes the plaintiff's claim that he can perform the essential functions must put forth evidence establishing those functions." *EEOC v. Wal-Mart*, 477 F.3d 561, 568 (8th Cir. 2007). The genesis of this rule is the recognition that "much of the information which determines those essential functions lies uniquely with the employer." *Benson v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1113 (8th Cir. 1995). In addition,

---

[6]While the plain language of the statute suffices to support our conclusion, it bears noting that the legislative history favors our reading as well. One of the Senate committee reports states that the qualification standard section of the ADA was meant to apply to "a person with a disability [who] applies for a job and meets all selection criteria *except one that he or she cannot meet because of a disability*." S. Rep. No. 101-116, at 37 (1989) (emphasis added). The legislative history also cites with approval *Prewitt v. U.S. Postal Serv.*, 662 F.2d 292, 306 (5th Cir. 1981) (cited by H. Rep. No. 101-485(III), at 42) (1990) *reprinted in* 1990 U.S.C.C.A.N. 445, 446, a Rehabilitation Act case that adopted the same prima facie case standard adopted here. *See Prewitt*, 662 F.2d at 306 (requiring the plaintiff to prove as part of his prima facie case "that he is qualified for the position under all *but the challenged criteria*" (emphasis added)).

the ADA and implementing regulations direct fact finders to consider, among other things, "the employer's judgment as to what functions of a job are essential," 42 U.S.C. § 12111(8); job descriptions prepared before advertising or interviewing applicants, *id.*; "[t]he amount of time spent on the job performing the function," 29 C.F.R. § 1630.2(n)(3)(iii); "[t]he consequences of not requiring the [applicant or employee] to perform the function," *id.* § 1630.2(n)(3)(iv); and the work experience of current and former employees. *Id.* § 1630.2(n)(3)(vi), (vii). Thus, to the extent that an employer challenges an ADA plaintiff's claim that he can perform the job's essential functions, we think it appropriate to place a burden of production on the employer to come forward with evidence of those essential functions. *See Wal-Mart*, 477 F.3d at 568; *Benson*, 62 F.3d at 1113.

[15] At trial the parties agreed that two of the "essential functions" of the package-car driver position are (1) "the ability to communicate effectively" and (2) "the ability to drive safely." UPS urged that "the ability to drive DOT-regulated vehicles" was another essential function. The district court rejected that contention, finding that UPS permits other drivers who cannot drive all DOT-regulated vehicles to drive package cars.[7] For example, UPS has protocols in place for driver applicants who cannot pass certain DOT certification requirements because of their vision impairments or insulin-dependent diabetes, but who can pass less stringent physical requirements. UPS has not shown that the district court's determination that DOT certification is not an essential job function was clearly erroneous. *See, e.g.*, *Taylor v. Rice*, 451 F.3d 898, 907 (D.C. Cir. 2006) (concluding that issues of fact regarding job's essential functions precluded summary judgment for employer because record showed that, in practice,

---

[7]The determination of essential functions is a factual finding we review for clear error. *See EEOC v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 730 (5th Cir. 2007) ("Appellate review of the jury's determination of the essential functions of [the employee's] job is highly deferential.").

employer did not require all other employees to abide by claimed essential function); *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003) ("The question of whether a job requirement is a necessary requisite to employment initially focuses on whether an employer actually requires all employees in the particular position to satisfy the alleged job-related requirement.").

Only the second essential function, "safe driving," is at issue in this appeal. UPS argues that "hearing" at a level sufficient to pass the DOT hearing standard is either a stand-alone essential job function or part and parcel of being a safe driver. This point illustrates the critical difference between a job's essential functions—"effective communication" or "safe driving"—versus a qualification standard based on "personal or professional attributes," such as hearing at a certain level. The question, then, is whether plaintiffs established that they meet the essential function of safe driving.

The district court found that Oloyede met UPS's threshold requirements of having no accidents or moving violations within the last year, no DUI within the last three years, and no more than three moving violations in the last three years. Habib also met the prerequisites to apply for the position: a valid driver's license, twenty-seven years of driving experience, and no evidence of even a minor traffic accident.[8]

UPS urges that Oloyede and Habib are required to show not only that they are "safe" drivers in the sense that they have a "clean driving record," but also that they are safe drivers even though they are hearing impaired. The district court rejected that argument, stating that imposing this burden would require plaintiffs to disprove the employer's business necessity affirmative defense, i.e., that the employer is justified in imposing

---

[8]It appears from the record (though it is not entirely clear) that neither Oloyede nor Habib was permitted to take UPS's road test or proceed to driver training because they could not meet the DOT hearing standard.

a qualification standard that facially screens out individuals with a specific disability.

Because UPS has linked hearing with safe driving, UPS bears the burden to prove that nexus as part of its defense to use of the hearing qualification standard. The employees, however, bear the ultimate burden to show that they are qualified to perform the essential function of safely driving a package car. In so doing, Oloyede and Habib need not disprove the validity of the hearing standard, but must demonstrate their safe driving ability vis-a-vis package cars. The inquiry is not whether Oloyede and Habib are capable of safely driving their personal cars, but rather whether they can drive the package cars at issue in this litigation. The district court did not make a finding with respect to plaintiffs' ability to drive package cars safely. Merely finding an absence of evidence with respect to driving a package car is insufficient. In short, Oloyede and Habib bear the burden of proving that they are qualified individuals with disabilities. They must show that they can perform the essential job function of safely driving package cars. Only if they meet this burden does the question become whether the qualification standard used by the employer satisfies the business necessity defense.

[16] By requiring UPS to justify the hearing test under the business necessity defense, but also requiring plaintiffs to show that they can perform the essential functions of the job, we are not saying, nor does the ADA require, that employers must hire employees who cannot safely perform the job, particularly where safety itself is an essential function. Nor are we saying that an employer can never impose a safety standard that exceeds minimum requirements imposed by law. However, when an employer asserts a blanket safety-based qualification standard—beyond the essential job function—that is not mandated by law and that qualification standard screens out or tends to screen out an individual with a disability, the employer—not the employee—bears the burden of showing that the higher qualification standard is job-related

and consistent with business necessity, and that performance cannot be achieved through reasonable accommodation. 42 U.S.C. § 12113(a).

This approach is parallel to the one adopted in a "direct threat" case under the ADA. 42 U.S.C. § 12113(b) ("The term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace."). Although the specifics of proof in direct threat and business necessity cases may vary, the frameworks are parallel. We emphasize that UPS is not required to meet the requirements of the direct threat defense, but rather that cases under that section of the ADA illuminate our analysis.

In *Branham*, the Seventh Circuit considered a qualification standard that disqualified an individual from being an IRS criminal investigator if the applicant had "[a]ny condition that would hinder full, efficient performance of the duties of the[ ] position[ ] or that would cause the individual to be a hazard to himself/herself or to others . . . ." 392 F.3d at 900 (quoting IRS qualification standard). Safety was an issue in *Branham*, as it is here. The parties did not dispute that an essential job requirement was the ability to function safely under the working conditions imposed on such employees. *Id.*

The IRS claimed that the applicant's diabetes placed him at risk of "subtle and/or sudden incapacitation, which would place the applicant and others . . . at an extreme risk of safety that would be unacceptable." *Id.* (citation and quotation marks omitted). The IRS also argued that the applicant bore the burden of establishing as part of his prima facie case that he did *not* pose a direct threat to himself or others. *Id.* at 906. In rejecting the IRS's position, the Seventh Circuit concluded that the applicant need only establish that he was "otherwise qualified" for the criminal investigator job by meeting the job's "essential functions." *Id.* at 904-05. And, because the IRS's "safety" qualification standard regarding the medical

condition incorporated the "direct threat" defense under the ADA, the employer bore the burden of proving that the employee was a direct threat. *Id.* at 906-07. The employee did not have to *disprove* the claim that he was a direct threat as part of his prima facie case of discrimination. *Id.* at 906-07.

The *Branham* approach works equally well in framing our analysis of UPS's hearing qualification standard. The employee does not bear the burden to invalidate the employer's safety-based qualification standard. Nor is the employee required to disprove UPS's contention that, in order to be safe, the driver must pass the DOT hearing standard—the very qualification standard disputed in this case. *See, e.g.*, *Cripe*, 261 F.3d at 889-90 (holding that a service requirement that rendered only disabled officers ineligible for specialized assignments could not be applied to them unless it was shown to be job-related and consistent with business necessity, and performance could not be achieved through reasonable accommodation); *McGregor*, 187 F.3d at 1116 (explaining that the ADA generally requires individualized assessment of whether a qualified individual is able to perform essential functions with or without reasonable accommodation, rather than use of blanket qualification standards, like a "100% healed" or "fully healed" policy, as substitute for such individualized determination).

Similar to the court in *Branham*, we conclude that an employee who shows that he meets the basic qualifications for the package-car driver position (seniority, twenty-one years of age, and holding a valid driver's license) and can drive a package car safely, including having a clean driving record and passing the driving test, is an otherwise qualified individual.

The last step of the "qualified individual" inquiry requires a plaintiff to show that he is qualified "with or without reasonable accommodation." 42 U.S.C. § 12111(8). If the plaintiff proves that he can perform the job's essential functions

either without a reasonable accommodation or with such an accommodation, then he has met his burden to show he is qualified. *See McGregor*, 187 F.3d at 1115; *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 146 (3d Cir. 1998) (en banc). Here, the district court did not explicitly discuss reasonable accommodation, although in finding that Oloyede and Habib met the job requisites and could perform the essential function of safe driving, it implicitly found that no accommodation was necessary to meet those baseline requirements for UPS package-car driver applicants.[9]

**[17]** Because the district court did not analyze whether Oloyede and Habib are "qualified individuals" capable of performing the "essential function" of safely driving a package car in the framework discussed above, nor did it directly undertake the "qualified individual" inquiry, we remand to the district court for the employees to prove that they are so qualified and for an analysis of reasonable accommodation. Thus, we vacate the district court's order denying UPS's motion for judgment on partial findings under Rule 52(c), and in the alternative to decertify the nationwide class under Rule 23(c)(1) and (d).

## D.  DISCRIMINATION BECAUSE OF DISABILITY

An employee bears the burden of proving that he was discriminated against "because of" a disability. 42 U.S.C. § 12112(a). *See Costa*, 299 F.3d at 857 ("The employee's ultimate burden of proof in all cases remains the same: to show by a preponderance of the evidence that the challenged employment decision was 'because of' discrimination."). The qualification standard at issue—the DOT hearing standard—is facially discriminatory and falls squarely within the ADA's definition of discrimination. 42 U.S.C. § 12112(b)(6) ("discrimination" includes using qualification standards,

---

[9]The question of reasonable accommodation also arises in the context of the business necessity defense, as discussed below in § III.E.

employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities").

The district court found, and UPS does not contest, that UPS applies a qualification standard that has the effect of discriminating on the basis of disability and/or screens out the class of employees who cannot pass the DOT hearing standard. *See* 42 U.S.C. § 12112(b)(6). Such discrimination violates the ADA *unless* UPS can prove a valid defense to its use of the DOT hearing standard. We therefore turn to UPS's defense that its reliance on the DOT hearing standard is justified under the business necessity defense.

### E.   EMPLOYER'S "BUSINESS NECESSITY" DEFENSE

Under the ADA, an employer may assert an affirmative defense to a claim that application of a qualification standard, test or selection criteria discriminates on the basis of disability. *See* 42 U.S.C. § 12113(a); *Albertson's*, 527 U.S. at 568. Although the shorthand reference is the "business necessity" defense, the defense also incorporates requirements of job-relatedness and reasonable accommodation.

**[18]** We most recently addressed the ADA's business necessity defense in *Morton*, 272 F.3d 1249. There, we held that the ADA's version of the business necessity defense incorporates concepts from both the traditional Title VII business necessity defense to disparate impact claims and the BFOQ defense in Title VII and Age Discrimination in Employment Act (ADEA) disparate treatment challenges to a proscribed classification. *Id.* at 1260-63. Today, we revisit our conception of the business necessity defense under the ADA and overrule *Morton* to the extent that it conflicts with this opinion.[10] Specifically, we reject *Morton*'s adaptation of the

[10]We do agree with *Morton*'s conclusion that the ADA's business necessity defense may be asserted to defend against disparate treatment,

Title VII and ADEA BFOQ safety standard requirement in the ADA context.

[19] We look first and foremost to the text of the ADA:

> It may be a defense to a charge of discrimination under this chapter that an *alleged application of qualification standards*, *tests, or selection criteria* that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be *job-related and consistent with business necessity*, and such performance *cannot be accomplished by reasonable accommodation*, as required under this subchapter.

42 U.S.C. § 12113(a) (emphasis added). To successfully assert the business necessity defense to an allegedly discriminatory application of a qualification standard, test or selection criteria, an employer bears the burden of showing that the qualification standard is (1) "job-related," (2) "consistent with business necessity," and (3) that "performance cannot be accomplished by reasonable accommodation." *Id.*; see *Cripe*, 261 F.3d at 890 (holding that the employer bears the burden of proving affirmative defense of business necessity).

Rather than analyzing each of these statutory components of the business necessity defense, *Morton* looked to other provisions of the ADA (the "qualified individual" requirement, the "undue hardship" defense, and the "reasonable accommodation" provision of the business necessity defense), and concluded that these provisions "suggest that Congress must have

disparate impact, and failure to accommodate claims under the ADA. *Morton*, 272 F.3d at 1260-61 (discussing interplay among 42 U.S.C. § 12112(b)'s various definitions of discrimination and § 12113(a)'s provision of the business necessity defense); *see Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003) (recognizing applicability of business necessity defense to both disparate treatment and disparate impact claims under the ADA).

intended to permit across-the-board exclusion of employees based upon disability-related safety criterion only on a showing somewhat similar to the one used for safety qualifications under the Title VII and ADEA [BFOQ] standard." *Morton*, 272 F.3d at 1261-62. We mistakenly concluded that "[i]f a transportation employer can demonstrate neither that all persons who fail to meet a disability-related safety criterion present an unacceptable risk of danger nor that it is highly impractical more discretely to determine which disabled employees present such an unacceptable risk—the Title VII/ADEA [BFOQ] safety standard requirements—we would not think that the safety criterion would provide an accurate measure of actual ability." *Id.* at 1263.

[20] However, as *Morton* recognized, "there is no [BFOQ] defense as such in the ADA." *Id.* at 1261. UPS argues, and we agree, that it is improper to import the BFOQ standard into the ADA business necessity defense. Instead, we return to the statutory provisions Congress set out for the ADA's version of the business necessity defense.

To show "job-relatedness," an employer must demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform the essential functions of the job. *See Cripe*, 261 F.3d at 890; H.R. Rep. No. 101-485 (III), at 32 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 454-55;[11] *see also Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946 (8th Cir. 1999);[12] *Hendricks-Robinson v. Excel Corp.*, 154

---

[11]"If a person with a disability applies for a job and meets all selection criteria except one that he or she cannot meet because of a disability, the criterion must concern an essential, and not marginal, aspect of the job . . . [and] be carefully tailored to measure the actual ability of a person to perform an essential function of the job." H.R. Rep. No. 101-485 (III), at 32 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 454-55.

[12]In *Belk*, the Eighth Circuit formulated its test as follows:

An employer urging a business necessity defense must validate the test or exam in question for job-relatedness to the specific

F.3d 685, 699 (7th Cir. 1998). When every person excluded by the qualification standard is a member of a protected class —that is, disabled persons—an employer must demonstrate a predictive or significant correlation between the qualification and performance of the job's essential functions. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975); *Cf. Clady v. County of Los Angeles*, 770 F.2d 1421, 1432 (9th Cir. 1985) ("As a general principle, the greater the test's adverse impact, the higher the correlation which will be required.") (analyzing business necessity defense to Title VII disparate impact claim).

**[21]** To show that the disputed qualification standard is "consistent with business necessity," the employer must show that it "substantially promote[s]" the business's needs. *Cripe*, 261 F.3d at 890 (quoting *Bentivegna v. U.S. Dep't of Labor*, 694 F.2d 619, 621-22 (9th Cir. 1982) (interpreting the term "business necessity" for purposes of the Rehabilitation Act of 1973)). As we observed in *Cripe*: "The 'business necessity' standard is quite high, and is not to be confused with mere expediency." *Cripe*, 261 F.3d at 890 (citation, quotation marks and alteration omitted). For a safety-based qualification standard, "[i]n evaluating whether the risks addressed by . . . [the] qualification standard constitute a business necessity, the court should take into account the magnitude of possible harm as well as the probability of occurrence." *EEOC v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000) (noting that "[t]he acceptable probability of an incident will vary with the potential hazard posed by the particular position: a probability that might be tolerable in an ordinary job might be intolerable for a position involving atomic reactors, for example").

---

skills and physical requirements of the sought-after position. Furthermore, an examiner must consider meaningful work-related information, including the type of activity to be performed [and] the level and duration of effort required.

*Belk*, 194 F.3d at 951 (citation and quotation marks omitted).

**[22]** Finally, to show that "performance cannot be accomplished by reasonable accommodation," the employer must demonstrate either that no reasonable accommodation currently available would cure the performance deficiency or that such reasonable accommodation poses an "undue hardship" on the employer.[13] *See* 42 U.S.C. §§ 12113(a), 12111(10) (defining "undue hardship"). *See McGregor*, 187 F.3d at *1116; see also Hendricks-Robinson*, 154 F.3d at 699 ("Even when 'physical fitness' is a selection criterion that is related to an essential function of the job . . . it 'may not be used to exclude an individual with a disability if that individual could satisfy the criterion with the provision of a reasonable accommodation.' ") (quoting 29 C.F.R. pt. 1630, App. § 1630.10) (quotation marks and alterations omitted).

The ADA does not provide a comprehensive recitation of what is encompassed by a reasonable accommodation, but gives some examples of what the term "may include." 42 U.S.C. § 12111(9); 29 C.F.R. § 1630.2(o)(2); *see also* 29 C.F.R. §§ 1630.2(o)(1) (defining "reasonable accommodation" to include "[m]odifications or adjustments" to application processes, work environment, and access to benefits and privileges of employment). Among the examples are accommodations such as:

(A)  making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B)  job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examina-

---

[13]S. Rep. No. 101-116, at 27 ("[T]his legislation prohibits use of a blanket rule excluding people with certain disabilities except in the very limited situation where in all cases physical condition by its very nature would prevent the person with a disability from performing the essential functions of the job, even with reasonable accommodations."

tions, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). Making a showing as to reasonable accommodation "may entail adopting an alternative, less discriminatory criterion." H.R. Rep. 101-485(II), 1990 U.S.C.C.A.N. 303, 354 (1990); *accord* S. Rep. No. 101-116.

**[23]** In rejecting UPS's business necessity defense to application of the DOT hearing standard to all package-car driving positions, the district court concluded that "UPS has demonstrated neither that all or substantially all deaf drivers pose a higher risk of accidents than non-deaf drivers nor that there are no practical criteria for determining which deaf drivers pose a heightened risk and which do not. Additionally, UPS has not demonstrated that it would be impossible to develop empirical evidence that would be sufficient to make either showing." This finding does not track the statutory elements of the business necessity defense. Because the district court understandably based its rationale on the then-extant *Morton* framework, we vacate the finding that UPS violated Bates's rights under the ADA, vacate the injunction, and remand for proceedings consistent with this opinion. We leave to the district court the determination whether additional evidence is appropriate in light of the significant change in the legal landscape of this case.[14]

One further aspect of *Morton* bears noting here. As part of its business necessity analysis under *Morton*, the district court

---

[14]Application of the business necessity defense is fact-intensive and requires close analysis by the district court. We note, however, that the employer is entitled to use a method of selecting drivers that will retain the overall safety record of its driver pool. Any suggestion in the district court's opinion that hearing-impaired drivers may be held to a lower safety standard than hearing drivers is disapproved. Ultimately, a disabled driver bears the burden to demonstrate that he can safely drive a package car.

also rejected UPS's reliance on the DOT's hearing standard. The district court pointed to *Morton*'s statement that "the existence of the—by its own terms inapplicable—DOT standard cannot shoulder UPS's statutory burden" to show business necessity. *Morton*, 272 F.3d at 1264-65 (holding that the mere existence of government safety standard did not demonstrate UPS's business necessity defense and fact issues precluded summary judgment).

Here, UPS offered up the DOT standard as evidence that, for safety purposes, a certain level of hearing is necessary to drive non-DOT-regulated vehicles. According to UPS, there is complete congruity between the positions of driving a DOT-regulated package car (more than 10,000 pounds) and driving a vehicle that weighs a little less. UPS argued that package cars weighing almost five tons do not have operating characteristics similar to passenger cars and pose greater risks than do passenger cars.

To be sure, DOT's regulation does not apply to the category of vehicles at issue in this case. However, that circumstance does not mean that the standard has no relevance to the employer's safety argument. UPS is entitled to use as some evidence of its business necessity defense the fact that it relied on a government safety standard, even where the standard is not applicable to the category of conduct at issue. To the extent *Morton* suggests or is interpreted to the contrary, it is overruled. *Cf. Albertson's*, 527 U.S. at 577 (holding that an employer is not required to justify its decision to require that employees meet an *applicable* government safety regulation, even if the government permits waiver of the applicable requirements under an experimental policy). The parallel consideration applies to an employee; that is, an employee may offer as evidence challenging the validity or applicability of a safety standard the government's refusal to adopt such standard to govern the conduct at issue. *See, e.g.*, 53 Fed. Reg. 18042, 18044 (discussing DOT's rejection of UPS's attempt to apply DOT's physical requirements to trucks under 10,000

pounds because (1) smaller trucks and vans have "operating characteristics" more comparable to cars; and (2) smaller trucks and vans pose a lesser "safety risk" than large trucks).

Thus, while certainly not dispositive of UPS's showing of job-relatedness, business necessity or the reasonableness of potential accommodations, UPS's reliance on the government safety standard with respect to other vehicles in its fleet should be entitled to some consideration as a safety benchmark. Whether, as UPS puts it, "non-DOT package cars in the UPS fleet share significant risk characteristics with their slightly larger cousins" is a factual question of the congruity between vehicles and drivers in UPS's non-DOT fleet and those regulated by DOT. *See Johnson v. Mayor & City Council*, 472 U.S. 353, 371 (1985) (federal rules on mandatory retirement age for firefighters may be relevant to nonfederal firefighters, depending on congruity of the occupations). We leave it to the fact finder to determine how much weight to give such evidence.

## IV.  CALIFORNIA STATE LAW CLAIMS

### A.  FEHA

UPS challenges the district court's holding that it violated the FEHA, arguing that there is no "qualified" plaintiff under the FEHA's requirements. UPS also argues that because different defenses are available under the FEHA than the ADA, the district court erred in concluding that because UPS violated the ADA, it *a fortiori* violated the FEHA with respect to the California subclass of plaintiffs.

[24] The California Supreme Court recently interpreted the FEHA as in accord with the ADA's requirement that a plaintiff asserting disability discrimination bears the burden of proving that he is a "qualified individual." *Green v. California*, 64 Cal. Rptr. 3d 390, 396 (Ca. 2007). In a supplemental submission to this court, UPS, citing *Green*, contends that

Oloyede—a named plaintiff and class representative of the California subclass—has not met his burden to show that he is a qualified individual within the meaning of the FEHA. UPS argues, as it did with respect to the ADA claims, that Oloyede is not qualified because he is unable to pass the DOT hearing test and he has not otherwise demonstrated that he can drive package cars safely.

As the court in *Green* explained:

> Under the FEHA, it is unlawful "[f]or an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition . . . of any person, . . . to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." [Cal. Gov't Code § 12940(a)] Although section 12940 proscribes discrimination on the basis of an employee's disability, it specifically limits the reach of that proscription, excluding from coverage those persons who are not qualified, even with reasonable accommodation, to perform essential job duties: "This part does not prohibit an employer from refusing to hire or discharging an employee with a physical or mental disability . . . where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations." (§ 12940, subd. (a)(1).)

*Id.* at 395.

Thus, a plaintiff asserting a disability employment discrimination claim under the FEHA must show that he is a "quali-

fied individual," meaning that he "can perform the essential duties of the employment position with reasonable accommodation." *Id.* at 397 (citing Cal. Gov't Code § 12940(a)(1)). The court further observed: "We see no statutory basis for construing the FEHA any differently from the ADA with regard to a plaintiff employee's burden of proof." *Id.*

**[25]** The bases for UPS's challenge to Oloyede's "qualified individual" status under the FEHA are identical to the arguments we rejected with respect to his qualified individual showing under the ADA.[15] Because we are vacating the district court's determination that Oloyede and Habib were "qualified individuals" under the ADA, we likewise vacate the district court's finding that the two were "qualified individuals" in the FEHA context.

After the district court's decision, we had occasion to address the interplay between the defenses in the FEHA and the ADA. In *EEOC v. United Parcel Service, Inc.*, we observed that the FEHA's "safety-of-others defense has no direct analogue in the ADA" and is broader than the ADA's direct threat defense, its closest analog. *See* 424 F.3d 1060, 1074 n.12 (9th Cir. 2005). UPS now contends that it is not liable under the FEHA, arguing, among other things, that it has satisfied the FEHA's safety-of-others defense.

Because our clarification of the applicable legal standard may bear on the district court's analysis, we do not address the finding that UPS violated the FEHA. Instead, on remand, the district court will have ample opportunity to reconsider this issue in light of *EEOC v. United Parcel Service, Inc. See* 424 F.3d at 1075 ("FEHA's safety-of-others defense requires

---

[15]UPS also argues that Oloyede is an inadequate class representative because he is unable to bid for a package-car driver position from his current position with UPS. We disposed of this argument with respect to the issue of standing and conclude that the scope of relief, if any, is best addressed by the district court on remand.

an individualized showing that safety would be compromised by each [employee's] performance of driving duties," although "[c]ategorical evidence can be relevant.").

### B.   UNRUH ACT

UPS also appeals the district court's holding that it violated the Unruh Act. The Unruh Act's central substantive statutory provision states that

> [a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

Cal. Civ. Code § 51(b). Section 51(f) of the Unruh Act provides that "[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 shall also constitute a violation of this section." *Id.* § 51(f) (citation omitted). Bates contends that because UPS violated the ADA's employment law provisions, it follows from section 51(f) that UPS also violated the Unruh Act.

[26] Bates's argument is foreclosed by our recent decision in *Bass v. County of Butte*, in which we held that the Unruh Act does not incorporate the employment discrimination provisions under Title I of the ADA. *See* 458 F.3d at 982. We reverse the district court's conclusion that the Unruh Act serves as a basis for relief against UPS.[16]

---

[16]A California Court of Appeal held similarly in *Williams v. Genentech, Inc.*, 42 Cal. Rptr. 3d 585 (Cal. Ct. App. 2006). On August 23, 2006, the California Supreme Court granted review of *Williams*, 49 Cal. Rptr. 3d 210 (2006), but deferred briefing pending the decision in *Green v. Califor-*

## V. INJUNCTION

The district court stayed enforcement of its injunction pending UPS's interlocutory appeal. We vacate the injunction and remand to the district court for further proceedings consistent with this opinion.

**VACATED IN PART, REVERSED IN PART, AND REMANDED.** Each party shall bear its own costs on appeal.

---

BERZON, Circuit Judge, with whom Circuit Judge REINHARDT joins, concurring in part, dissenting in part, and concurring in the judgment:

I would approach the "qualified individual" and Department of Transportation (DOT) hearing standard inquiries differently than does the majority, but do agree that this case must be remanded for re-examination under the majority's statement of the business necessity framework. I therefore concur only in Parts I, II, III(A)-(C)(1), III(D), III(E), IV(B), and V of the majority opinion, and in the judgment.[1]

---

*nia.* Now that the decision in *Green* has been issued, if the California Supreme Court reaches a different conclusion in *Williams* than we did in *Bass*, our holding here will not be the law of the case. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986) (writing that a federal appellate court "will follow a state supreme court's interpretation of its own statute in the absence of extraordinary circumstances"); *Ingle v. Circuit City*, 408 F.3d 592, 594 (9th Cir. 2005) (holding that a district court abuses its discretion in applying the law of the case doctrine if "an intervening change in the law [has] occurred"). Instead, the California Supreme Court decision will be binding on any later proceedings as they relate to Bates's Unruh Act claim.

[1]To be clear: I do not concur in Parts III(C)(2) and IV(A), and in any portion of the majority opinion that restates the holdings of those sections.

## I.

The majority holds that to be "qualified individuals with disabilities" Oloyede and Habib (or some other member of the class) must show that they can "perform the essential job function of safely driving package cars." Maj. Op. at 16909. The majority opinion is entirely unclear, however, as to how they are to do so. In my view, such a requirement can be squared with the statute and with the complaint in this case, if at all, only if understood as imposing a definable, threshold burden.

## 1.

Oloyede and Habib ask in their complaint just that the district court order UPS to "individually assess . . . hearing disabled workers to determine if they are able to safely drive vehicles where DOT regulations are not applicable." In other words, although the plaintiffs certainly hope eventually to become package car drivers, they are *not* seeking to bypass UPS's package car driver testing, training, and probation programs and be placed directly into the driver's seat. The district court explicitly limited its relief to mandating individual assessment.

UPS's requirements and programs are extensive. First, applicants must have adequate seniority and clean driving records to begin the application process. Then, in addition to the DOT physical, applicants must pass a driving test to enter the program. If they pass, they enter a driving training course with both on-the-road and classroom components. If they pass *that* course, they embark on a thirty-day probationary period, with supervisors sometimes riding along. Only if they pass all these hurdles do those who enter the program become UPS package car drivers.

The majority opinion would require the plaintiffs to bear the ultimate burden of proving that they will be safe package

car drivers, so as to show that they are qualified persons with disabilities. But, perhaps because it does not recognize the limited nature of the relief sought, the majority leaves unclear what it is asking of the district court and of the parties on remand with regard to that requirement.

Requiring the plaintiffs to prove that they will be safe package car drivers, as the majority opinion does, will unnecessarily complicate this litigation on remand. "Safe" is not a self-defining term, and particularly is not so in the context of industrial safety decisions; nor is it self-evident whether any particular scheme for predicting whether a person who has never driven a package car safely will be able to do so is likely to yield valid results.[2] Thus, asking Oloyede and Habib to prove that they are "safe" without providing guidance as to how they are to do so, or as to how "safe" is "safe" in this context, presents the litigants and the district court with an ill-defined and complicated puzzle. Yet, such a requirement is extraneous given the limited nature of the relief Oloyede and Habib seek. UPS has designed evaluation methods using its own vehicles to test for the degree of safety it requires, so it makes little sense to suggest that Oloyede and Habib must devise, validate, and pass their *own* safety tests and training programs before they may sue to take *UPS's* tests and training programs — which, again, is all that they seek to do.

Here, what makes sense is to require the plaintiffs to meet UPS's threshold requirements for entry into the package car driver testing and training program. UPS itself will then be able individually to evaluate them for the job they desire, according to UPS's own standards and methods (with appro-

---

[2]Industrial "safety" is necessarily a relative concept. Companies such as UPS must accept that their operations can never be *perfectly* safe, and so must determine the level of risk they are willing to take. Deciding whether a given activity is sufficiently "safe" thus requires balancing the acceptability (in both moral and financial terms) of a certain degree of risk against the costs of avoiding the risk and the company's human resources needs.

priate accommodations, if requested and if the need for them is proven, *see* 42 U.S.C. § 12111(8)-(9) (defining "qualified individual" and "reasonable accommodation"); *Dark*, 451 F.3d at 1088 (explaining the reasonable accommodation process)).[3]

Practically speaking, under the approach I suggest, once a deaf applicant shows that he meets the normal threshold qualifications for eligibility — that he is at least twenty-one years of age, possesses a valid driver's license, and has a clean driving record by UPS's local standards — he has met his burden of proof in this regard. It is then UPS's burden to show, if it desires to adopt as a threshold requirement a minimum hearing level such as the DOT standard, that it can establish under

---

[3]I note that to recognize that Oloyede and Habib suffer a discriminatory wrong when they are rendered ineligible to compete for a driver job by being barred from becoming candidates for the job is consistent with antidiscrimination law generally. In *Regents of the University of California v. Bakke*, 438 U.S. 265, 281 n. 14 (1978), the Supreme Court rejected the notion that Bakke, who was challenging medical school admissions affirmative action policies that he contended discriminated against him, was required to "prove that he would have been admitted in the absence of the [policies]" to have standing to challenge them. Rather, "the University's decision not to permit Bakke to compete for all 100 places in his class, simply because of his race," satisfied the injury requirement. *Id.*

Similarly, in *Northeast Florida Chapter of the Associated General Contractors of America v. Jacksonville*, 508 U.S. 656, 664 (1993), a contractor group could challenge a city's affirmative action policy without having to show that "one or more of its members would have been awarded a contract but for the challenged ordinance." Rather, the injury is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.* at 666. "The injury in cases of this kind is that a 'discriminatory classification prevent[s] the plaintiff from competing on an equal footing." *Adarand Constructors, Inc. v. Pena*, 515 U.S.200, 211 (1995) (quoting *Northeast Florida*, 508 U.S. at 667) (alteration in original); *see also Bras v. California Public Utility Comm'n*, 59 F.3d 869, 873 (9th Cir. 1995) (following this analysis). The injury suffered by Oloyede and Habib is manifestly of this type. It would be strange to construe the ADA as out of harmony with general antidiscrimination and equal protection law.

the business necessity test that deaf applicants as a group who do not meet that requirement cannot drive package cars safely. Unless UPS can establish a business necessity supporting such a blanket requirement, either by validating the application of the DOT standard to deaf drivers or by adopting some other validated standard for such drivers, it must allow hearing impaired applicants to take the same initial driving test, benefit from the same training program, and be subject to the same final test as all other applicants, all with reasonable accommodations if necessary.

This approach in no way compromises the safety of UPS's driving force, as there are other stages, after applicants are deemed qualified to commence training, at which drivers, including deaf drivers who cannot safely drive package trucks, may be weeded out. If the final test, for example, shows that a deaf applicant is fully capable of driving safely, regardless of the extent of his hearing impairment, he should not be disqualified from employment. If, however, it reveals that an applicant's hearing impairment results in an inability to avoid accidents to the same extent as drivers without hearing impairments, he should be deemed to have failed the test. The key, accordingly, is to design a training and testing program that will eliminate all applicants who pose a safety hazard regardless of whether the cause is hearing impairment, inadequate vision, lack of judgment, slow reflexes, lack of intelligence, or some disability other than a hearing impairment.

In this case, should the plaintiffs prevail and be allowed to undergo the training program, UPS would be free to design a test to be administered following its completion. By doing so, it would test the ability of all potential employees, including those who are hearing-impaired, to drive in a safe manner. Oloyede and Habib would be allowed, if they pass the initial driving test, to enroll in the training program and take the final test upon its completion. Those who fail the testing and training program for reasons related to their hearing impair-

ment, would, of course, be entitled to challenge it on the ground that it did not properly measure whether such employees could perform the essential functions of the position. But, absent such a challenge, and absent UPS proof of the DOT standard or some other hearing impairment standard as a business necessity, plaintiffs and other deaf drivers would demonstrate that they are safe drivers in the same manner as all other employees who desire to be package car drivers.

As I read the district court's opinion, it is consistent with this basic approach. I would not, therefore, vacate the district court's holding on the "qualified individual" point.[4]

## 2.

The majority opinion holds, instead, that the district court erred by not specifically examining whether Oloyede and Habib are now capable of *driving* a package car safely, rather than just whether they can drive safely enough to be eligible for UPS's package car driver assessment program. Maj. Op. at 16911. Still, the majority opinion may not require significantly more proof of Oloyede and Habib than they have already adduced, except in one respect.

UPS does not decide whether participants in its training program can drive a package car safely enough to meet UPS's risk standards until the *end* of the program. Instead, it uses the entry requirements and the initial phases of the training program— most notably, a driving test — to decide whether applicants are, at a first cut, *likely* to be able to perform that essential job function and so should be allowed to continue training for the job. Surely, Oloyede and Habib, who have

---

[4]The majority takes the same course while analyzing whether Oloyede is a "qualified individual" under California's Fair Employment and Housing Act (FEHA). Maj. Op. at 16920-23. I therefore also do not concur with that section of the opinion, for the same reasons given here with regard to the ADA.

never driven package cars, are not required to show that they are *more* able to perform the essential job function of ultimately driving a package car safely than any other similarly inexperienced UPS employee who successfully passes the initial screening for the training program. Instead, they must simply be as qualified as hearing employees must be at that initial stage. The majority's description of its required evidentiary showing suggests as much, as it would include meeting UPS's entrance requirements and tests, including "having a clean driving record," *and* "passing the driving test," not more. *Id.*

So, on remand, the district court may approach the qualified individual inquiry under the majority opinion by deciding whether the plaintiffs can show that they are likely to be able to drive package cars as safely as other training program *entrants*. The district court, on remand, may rely upon the evidence already provided by Oloyede and Habib, or on any other evidence they may introduce. Also, the district court may order discovery on the UPS driving test given to program entrants to allow Oloyede or Habib (or some other class representative) to reconstruct and then take the same test. Members of the class who meet all valid requirements and can pass that test, with or without reasonable accommodations, would then be as qualified to be package car drivers as other employees entering the training program, and will meet their burden of proof in this litigation.

To require the plaintiffs to show any more to meet their burden of proof would be to suppose that UPS's training program is a useless formality in no way essential to teaching strategies and skills necessary to drive package cars safely. UPS obviously does not believe that, and neither should we. As deaf potential drivers have not had the opportunity to learn those skills and strategies, they cannot fairly be measured for safety against drivers who have. And, there is no way potential deaf drivers can reproduce and prove that they can pass a several-week program supervised by experienced UPS train-

ers. So, as far as I can tell, deaf drivers should be able to show they can drive a package car safely and so are "qualified persons with a disability," as the majority requires, simply by passing a driving test equivalent to the one UPS requires to enter its package car driver training program.

## II.

The majority opinion is also somewhat unclear on how the district court should review the evidence supporting UPS's business necessity defense of the DOT hearing standard. The majority remands on this question, directing the district court to give "some consideration" to the DOT's use of the standard for larger vehicles as evidence for business necessity. Maj. Op. at 16920.

It appears to me that the district court has largely already done so. It devoted several pages of careful analysis to explaining the empirical and statistical deficiencies inherent in extending the DOT hearing standard beyond the area in which it now applies. It examined the studies supporting such an extension, noting that the data supporting their conclusions is "extremely dated," that the studies used different definitions and methodologies and so are not easily comparable, and that the studies do not, themselves, tie the DOT hearing standard to particular risk levels.

Nor do I think that *Morton v. UPS*, 272 F.3d 1249, 1264-65 (9th Cir. 2005) directed the district court simply to disregard the evidentiary weight of the DOT hearing standard, as the majority suggests. *Morton* held that the mere existence of the standard "cannot shoulder UPS's statutory burden because the standard itself does not cover vehicles below its weight threshold." *Id.* at 1264. Instead, *Morton* directed the district court to analyze the data supporting extending the DOT standard to non-DOT vehicles. *Id.* The district court in this case did exactly that. Its analysis led it to conclude that the extension of the DOT hearing standard was not supportable under

the version of the business necessity defense set forth in *Morton*.

In any event, the majority does not disapprove of the district court's factual findings on this point, and instead only remands to the district court for it to consider the question under the business necessity framework that the majority opinion today enunciates. That directive is perfectly proper, because it is possible — although, I suggest, not probable — that the analysis will come out differently under the business necessity standard as we enunciate it today. But nothing in the majority opinion prevents the district court from examining in that context the same methodological and empirical flaws it previously discussed.

Those flaws may well be significant under today's standard. As the majority demonstrates, "business necessity" is not an easy hurdle for an employer to surmount, particularly when using discriminatory employment tests or qualification standards. As we have held in the Title VII context, "[a]s a general principle, the greater the test's adverse impact [on protected individuals], the higher the correlation [between the qualification standard and the essential functions of the job] which will be required." *Clady v. County of Los Angeles*, 770 F.2d 1421, 1432 (9th Cir. 1985). Here, UPS's use of the DOT hearing standard excludes, if not 100% of deaf individuals (as a few may pass), then at least the vast majority of such individuals. Under our law, such a facially-discriminatory qualification standard must be well-justified indeed. The district court's initial analysis demonstrates the thinness of the data supporting UPS's use of the DOT hearing standard. On remand, the district court will have to decide whether the business necessity framework, as described in the majority opinion, can tolerate such serious impacts justified with such scanty data.

Only if the district court decides that the DOT hearing standard is supported by business necessity could UPS use the

hearing standard to exclude deaf individuals as a group. Any other result would leave in place the barriers, based in group stereotypes rather than in thoughtful individual consideration, that the ADA seeks to root out of American society.

\* \* \* \* \*

With these comments, I concur in Parts I, II, III(A)-(C)(1), III(D), III(E), IV(B), and V of the majority opinion, and in the judgment.