**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LARRY ROHR,
               *Plaintiff-Appellant,*

    v.

SALT RIVER PROJECT AGRICULTURAL
IMPROVEMENT AND POWER DISTRICT,
a political subdivision of the State
of Arizona,

           *Defendant-Appellee.*

No. 06-16527

D.C. No.
CV-04-03015-FJM

OPINION

Appeal from the United States District Court
for the District of Arizona
Frederick J. Martone, District Judge, Presiding

Argued and Submitted
July 15, 2008—San Francisco, California

Filed February 13, 2009

Before: Richard A. Paez and Marsha S. Berzon, Circuit
Judges, and Harold Baer, Jr.,* Senior District Judge.

Opinion by Judge Baer

---

*The Honorable Harold Baer, Jr., United States Senior District Judge
for the Southern District of New York, sitting by designation.

## COUNSEL

Linda D. Skon, Law Office of Linda D. Skon, Mesa, Arizona, for the plaintiff-appellant.

John J. Egberg, Esq., Jennings, Strauss & Salmon, P.L.C., Phoenix, Arizona, for the defendant-appellee.

## OPINION

BAER, Senior District Judge:

Larry Rohr appeals the district court's grant of summary judgment in favor of his former employer, Salt River Project Agricultural Improvement and Power District ("Salt River"). Rohr, who is an insulin-dependent type 2 diabetic, brought suit for employment discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et*

*seq.* Because the district court erred in concluding that Rohr was neither "disabled" nor a "qualified individual" under the ADA, we vacate the district court's order of summary judgment and remand for further proceedings consistent with this opinion.

At the outset, we note that on September 25, 2008, while this decision was pending, the ADA Amendments Act of 2008 ("ADAAA") was signed into law in order "[t]o restore the intent and protections of the Americans with Disabilities Act of 1990." Pub. L. No. 110-325, 122 Stat. 3553 (2008). In the ADAAA, Congress emphasizes that when it enacted the ADA in 1990, it "intended that the Act 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities' and provide *broad* coverage." *Id.* § 2(a)(1), 122 Stat. at 3553 (emphasis added). The ADAAA rejects the Supreme Court's interpretation of the term "disability" in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999), and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184 (2002), and thereby expands the class of individuals who are entitled to protection under the ADA. *Id.* § 2(b), 122 Stat. at 3553. Indeed, Congress signifies that as a result of these Supreme Court cases, "lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities." *Id.* § 2(a)(5), 122 Stat. at 3553.

Although the ADAAA, if applicable, would provide additional support for Rohr's claims in this case, we hold that, even under our pre-ADAAA case law, Rohr provided sufficient evidence that he was a "qualified individual" with a "disability" under the ADA to survive summary judgment. We therefore need not decide whether the ADAAA, which took effect on January 1, 2009, applies retroactively to Rohr's claims.

## I.  BACKGROUND

### A.  Rohr's Job at Salt River

From May 1981 to June 14, 2004, Rohr worked as a welding metallurgy specialist in the Plant Technical Support Group at Salt River, which provides utility services to homes in Arizona. **[ER 2, 3.]** The Plant Technical Support Group was composed of specialists in various fields, including welding metallurgy, turbines, boilers and cathodic protection, as well as the quality assurance staff. **[ER 16.]** The group's objective was to address problems that Salt River's power plants could not solve on their own. **[ER 16.]** For example, if a power plant requested a new welding procedure, the specialists in the Plant Technical Support Group would design it. **[ER 17.]** The Plant Technical Support Group performed audits, reviewed paperwork on the plants to determine whether any applicable code had been violated and responded to third-party inspections. Rohr characterizes the group's work as mostly "engineering-type support." **[ER 17-18.]**

As a metallurgy specialist, Rohr was primarily responsible for overseeing all aspects of Salt River's welding procedures, maintaining Salt River's welding manual, training all welding personnel, reviewing and auditing the work of subcontractors, ensuring that all welding procedures complied with applicable codes and specifications, advising Salt River on the purchase of new welding equipment, and counseling less experienced welders. **[ER 17-19, 61.]** While he often traveled to individual power plants to perform inspections and to train welders, engineers and welding inspectors **[ER 19]**, he claims that the majority of his work was in an office environment. **[ER 17-18, 105.]**

The Plant Technical Support Group was rarely required to travel, but occasionally, when outages occurred, *i.e.,* when one of Salt River's generators stopped producing power, "borrowed hands" were requested. **[ER 20.]** Over the course of

twenty-three years Rohr worked as a "borrowed hand" at a power station about a dozen times. The parties dispute whether this support role was an "essential function" of Rohr's position. **[ER 18, 21.]** During an outage, the work of a specialist, such as Rohr, could require ten to twelve hours per day in the field, seven days a week. Rohr claims, without contradiction, that he had not been assigned to such out-of-town field work since at least 2001 and that major outages had become increasingly infrequent over the last several years.[1] **[ER 18.]**

## B.   Rohr's Diabetes Diagnosis

Rohr was diagnosed as an insulin-dependent type 2 diabetic in 2000. From that time, the medical necessities of insulin injections, medicine, blood tests and a strict diet have been fixtures of his daily life.[2] **[ER 3, 47, 89.]** As a result of his diabetes, Rohr suffers from chronic high blood pressure, deteriorating vision and occasional loss of feeling in his hands and

---

[1]However, the record indicates that on or shortly before June 11, 2003, Rohr's supervisor told him that he needed to come to the office "always prepared to go out in the field at a moment's notice." **[ER 64.]**

[2]Type 2 diabetes "[r]esults from insulin resistance (a condition in which the body fails to properly use insulin), combined with relative insulin deficiency." American Diabetes Association, *All About Diabetes*, www.diabetes.org/about-diabetes.jsp. Type 1 diabetes, sometimes referred to as juvenile diabetes, results from the body's failure to produce insulin at all. "Insulin is a hormone that is needed to convert sugar, starches and other food into energy needed for daily life." In the United States, approximately 23.6 million children and adults, or 7.8% of the population, have type 1 or 2 diabetes. While type 2 diabetes, unlike type 1, is frequently perceived as controllable without insulin injections, some type 2 diabetics, like Rohr, do require insulin. Whether type 1 or 2, "[d]iabetes is associated with an increased risk for a number of serious, sometimes life-threatening complications," including heart disease, stroke, high blood pressure, blindness, kidney disease, nervous system disease, amputations, dental disease, complications of pregnancy and sexual dysfunction. American Diabetes Association, *Complications of Diabetes in the United States*, http://www.diabetes.org/diabetes-statistics/complications.jsp.

feet. **[ER 47, 89.]** He tires more quickly than he did before the onset of the disease, especially when he drives for long periods of time or is exposed to heat for some length of time. **[ER 65.]**

Within a few years of the onset of his diabetes, Rohr's medical condition affected his position at Salt River in two respects. First, pursuant to Occupational Health and Safety Administration ("OSHA") guidelines, Salt River required all employees who might be required to use a respirator, which included the Plant Technical Support Group, to obtain and renew a respirator certification annually; this necessitated a yearly medical evaluation. Although Rohr had successfully renewed his respirator medical certification for at least ten years, in 2003 Salt River's Health Services Department refused to administer the breathilator portion of the test to Rohr because of his high blood pressure, which was related to his diabetes. **[ER 29-30, 63, 89, 120.]** When Rohr returned on a different day, the Health Services Department again refused to administer the test because his blood pressure was too high. **[ER 31.]** As a result, Rohr could not complete the medical evaluation and was unable to renew his respirator certification. **[ER 30.]** Salt River offered no alternative test by which Rohr could complete the respirator certification requirement.

Second, in August 2003 Rohr learned that he would be assigned to work on what promised to be a five- or six-week project to repair an outage at Salt River's Navajo Generating Station in Page, Arizona. **[ER 35.]** This was the first time in several years that he had been asked to help as a "borrowed hand" in the field. **[ER 24.]** The assignment prompted him to write his supervisors a letter requesting certain accommodations due to his disease. **[ER 37, 65, 79, 89.]**

His letter explained that while his diabetes had been first diagnosed in 2000, he had likely had the disease for a much longer time. It was not until recently, however, that diabetes

significantly affected his work and personal life. **[ER 65.]** Now, his condition was deteriorating: despite daily insulin injections, medication and stringent diet, his vision had decreased, his hands and feet sometimes felt numb, and exhaustion made him sick rather than simply tired. Sometimes he felt sick for no apparent reason. **[ER 65.]** He had to follow a "very demanding regimen" to manage his diabetes. In addition to daily injections of insulin, he had to test his blood sugar three to four times a day, could not eat large meals or skip meals and needed to snack on something every few hours. **[ER 65.]** During travel he had to find a way to keep his insulin refrigerated or chilled. Changes in the length of his work day greatly affected his treatment routine. **[ER 65.]** Because his condition was deteriorating, his doctor had doubled the strength of his medication and increased the units of insulin that he took each day. **[ER 89.]** He told his supervisor that his treatment had become his first priority and he had to schedule "everything else" in his life around it. **[ER 89.]**

As accommodations for the efforts required to control his diabetes, Rohr requested that he not be required to drive for more than three or four hours at a time, engage in strenuous activities, work more than an eight- or nine-hour shift, work in extreme heat, climb scaffolding or ladders, work around moving machinery, or go on overnight out-of-town travel. **[ER 90.]** These accommodations were necessary, he asserted, because he otherwise would become exhausted, overheated, weak or dizzy due to his diabetes, and travel could exacerbate his condition because it made it difficult to follow his diet and treatment regimen. **[ER 89.]**

### C.   Rohr's Permanent Work Restrictions

A nurse at Salt River's Employee Health Services Department received Rohr's letter and instructed Rohr's supervisors to refrain from sending him on out-of-town travel, including the outage at the Navajo Generating Station, until he could obtain his doctor's opinion. **[ER 39, 66.]** Rohr met with his

doctor, Dr. Stephen Dippe. In a note dated August 27, 2003, Dr. Dippe recommended that Rohr "not be given overnight out-of-town assignments and that he avoid becoming over exhausted such as working more than 9 hours a day or being exposed to extreme heat." **[ER 67.]**

About a week later, a doctor employed by Salt River, Dr. Timothy Woehl, examined Rohr and prepared a list of permanent work restrictions:

1)  No rotating shift work.

2)  A workday limited to 9 hours per day.

3)  Limitation on thermal stress avoiding prolonged work in high temperature poorly ventilated work areas with preference to prolonged work in climate-controlled environments only [sic].

4)  No heavy exertional activities . . . .

5)  No working from unprotected heights and no unprotected climbing.

6)  He should be required to carry with him an immediate source of sugar such as a sugar tablet during working hours.

**[ER 97.]** Dr. Woehl disagreed with the restriction on overnight out-of-town travel recommended by Dr. Dippe because he believed it was not travel itself that posed problems but rather the nature of the work that Rohr was asked to do during overnight travel assignments. **[SER 4.]** Nevertheless, Salt River implemented all the requested accommodations, including the travel restriction.

About five months later, on February 19, 2004, Dr. Woehl reexamined Rohr and reported to Rohr's supervisor that the

recommended permanent restrictions remained unchanged. He stated that "[i]t remains my opinion that Mr. Rohr is physically able to perform the essential functions of his job with the accommodations as outlined." **[ER 103.]** On March 3, 2004, Rohr's supervisors asked Dr. Woehl to clarify whether the travel restriction was still in effect, and Dr. Woehl responded that Rohr should continue to refrain from overnight travel, even though Dr. Woehl had previously thought that this restriction was unnecessary. **[SER 5.]**

On March 16, 2004, Rohr's supervisors and the Salt River Labor Relations Department told Rohr that his work restrictions were preventing him from performing the essential functions of his job, such as overnight travel to assist as a borrowed hand during outages and travel to conduct inspections and trainings. They presented Rohr with three options: (1) remain in his position for up to ninety days while he pursued another position within Salt River that would be consistent with his work restrictions; (2) apply for disability benefits; or (3) take early retirement. Rohr was given until June 14, 2004 to make his choice. **[SER 2; ER 69, 76.]**

#### D.   Rohr Requests Removal of Travel Restriction

Rohr then wrote to his doctor, Dr. Dippe, stating that he did not believe his medical condition prevented him from doing any travel and that Salt River had misinterpreted the doctor's recommendation to mean that he should refrain from *all* travel. **[SER 25.]** On April 23, 2004, Dr. Dippe stated that in his opinion, "it is no longer necessary to restrict patient Larry Rohr regarding any travel that may be associated with his job assignments (including overnight stays for multiple days), providing he adheres to the other restrictions currently imposed on him." **[ER 68.]**

Nearly a week later, Dr. Woehl informed Rohr's supervisors that, despite Dr. Dippe's note, he was not in favor of lifting the travel restriction unless Dr. Dippe could produce

medical documentation and an explanation as to why Rohr could now travel, since Rohr had pled his case against out-of-town overnight travel at great length. Dr. Woehl indicated he was concerned that Rohr was trying to manipulate Dr. Dippe and Salt River to remove his travel restriction "for other than medically necessary reasons." **[SER 5.]**

Several weeks later, in a letter dated May 20, 2004, Dr. Woehl asked Dr. Dippe to explain how Rohr's medical condition had materially changed, so that he now could travel safely out of town and overnight. **[SER 5.]** In a letter dated June 8, 2004, Dr. Dippe explained that even though Rohr had to take Actos, Metformin, glipizide and insulin to manage his diabetes and required ongoing care from a cardiologist, Rohr had been "fairly stable for quite some time" and did not appear to be at risk for hypoglycemia. **[SER 13.]** Dr. Dippe indicated that overnight travel would pose no problem so long as Rohr could monitor his sugar level, take his insulin and medication, maintain his diet and avoid hazardous work. **[SER 13.]**

Rohr claims that he would have been able to travel to power plants to perform inspections or conduct trainings, as these activities did not conflict with his restrictions, and that Salt River should have permitted him to do so. His restrictions, however, did not permit him to travel to work as a "borrowed hand" during plant outages, as this type of assignment involved climbing, hot and hazardous environments and long hours. **[ER 107.]** He asserts that Salt River could have assigned someone else to do such "borrowed hand" work instead of him, as the work involved being a "helper" to carry equipment, record data, and the like, and anyone could have done it. **[ER 107.]**

On June 14, 2004, Rohr informed Salt River that he chose the option of applying for disability benefits. He began a leave of absence the next day, and the day thereafter filed a charge of discrimination with the Equal Employment Oppor-

tunity Commission ("EEOC"), alleging that Salt River discriminated against him on the basis of both age and disability. **[ER 13, 69.]** Salt River informed him that his job protection rights, *i.e.*, the period during which his job could not be filled on a regular basis, expired on December 15, 2004. **[ER 113.]**

In December 2004 Rohr filed suit in federal court.[3] **[ER 1-11, 105, 119.]** On July 14, 2006, in an unpublished order, the district court granted summary judgment in favor of Salt River. Rohr timely appeals.

## II.   ANALYSIS

We review *de novo* the district court's grant of summary judgment. Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there is a genuine issue of material fact and whether the district court correctly applied the relevant substantive law. *See Gribben v. United Parcel Service, Inc.*, 528 F.3d 1166, 1169 (9th Cir. 2008) (citing *Summers v. A. Teichert & Son, Inc.,* 127 F.3d 1150, 1152 (9th Cir. 1997)).

The ADA prohibits employers from "discriminat[ing] against a qualified individual with a disability," 42 U.S.C. § 12112(a), and requires employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee] with a disability," *id.* § 12112(b)(5)(A). The district court held that Rohr was not entitled to ADA protections because he failed to raise a material issue of fact concerning whether he had a "disability" within the meaning of the ADA, and because his inability to complete the respirator certification test rendered him unqualified for his position. We disagree with both holdings.

---

[3]In addition to his ADA claim, Rohr also brought a claim for employment discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.*, but voluntarily withdrew that claim prior to the district court's disposition.

## A.   "Disability"

[1] The ADA defines "disability," in pertinent part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2). Diabetes is a "physical impairment" because it affects the digestive, hemic and endocrine systems, and eating is a "major life activity."[4] *Fraser v. Goodale*, 342 F.3d 1032, 1038-40 (9th Cir. 2003). Whether Rohr's diabetes substantially limits his eating is an "individualized inquiry." *See Fraser*, 342 F.3d at 1039. Once an impairment is found, the issue is whether Rohr's diabetes substantially limits his activity of eating. We find that the district court erred in concluding that it did not.

### 1.   Rohr's Insulin-Dependent Diabetes May Qualify As a Disability

[2] To determine whether an insulin-dependent type 2 diabetic like Rohr is substantially limited in his eating, we must compare "the condition, manner or duration under which he can [eat] as compared to the condition, manner or duration under which the average person in the general population can [eat]." *Fraser*, 342 F.3d at 1040 (internal quotation marks omitted). The fact that a plaintiff "simply *differs* from the average person in how she performs a major life activity is patently insufficient for a substantial limitation." *Id.* (emphasis in original). Rather, in deciding whether the impairment is substantially limiting, courts "must consider the nature and severity of the [plaintiff's] impairment, the duration or expected duration of the impairment, as well as the permanent

---

[4]Under the applicable federal regulations, major life activities also include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); 29 C.F.R. § 1630.2(i). A "major life activity" must be of "comparative importance" and "central to the life process itself," and need not have a public, economic or daily character. *See Fraser*, 342 F.3d at 1039 (quoting *Bragdon v. Abbott,* 524 U.S. 624, 638 (1998)).

or long term impact of the impairment." *Id.* at 1038 (internal citations omitted).[5] Rohr must show that his diabetes significantly restricts his eating. *Id.*

At the summary judgment stage, "precedent does not require comparative or medical evidence to establish a genuine issue of material fact regarding the impairment of a major life activity . . . . Rather, . . . a plaintiff's testimony may suffice to establish a genuine issue of material fact." *Head v. Glacier Northwest Inc.*, 413 F.3d 1053, 1058 (9th Cir. 2005). However, "[t]o survive summary judgment, an affidavit supporting the existence of a disability must not be merely self-serving and must contain sufficient detail to convey the existence of an impairment." *Id.* at 1059.

**[3]** Finally, we must consider not only whether the symptoms of Rohr's diabetes substantially limit one of his major life activities, but also whether his efforts to mitigate the disease constitute a substantial limitation. The Supreme Court directed in *Sutton* that "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures—both positive and negative—must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." 527 U.S. at 482. We therefore consider the effectiveness, side effects and burdens of a plaintiff's mitigating measures. *Id.* at 482-84.

**[4]** We conclude that Rohr has raised a genuine issue of material fact as to whether his diabetes substantially limits his

---

[5]The Supreme Court has made clear that the substantial limitation inquiry is not limited to the effects of the impairment in the workplace. *See Toyota*, 534 U.S. at 200-01. Rather, the proper inquiry is whether the physical impairment substantially limits the claimed major life activity in daily life. Put another way, "[w]hether [a plaintiff] faced substantial limitations in his ability to work is irrelevant to whether his limitations in other major life activities qualify him as disabled for ADA purposes." *McAlindin v. County of San Diego*, 192 F.3d 1226, 1233 (9th Cir.1999).

life activity of eating. The record is replete with statements, both by Rohr and his doctors, that to manage his disease Rohr is required to strictly monitor what, and when, he eats. Rohr stated that these restrictions constrain him every day, "whether it's a workday, a weekend or a holiday." **[ER 65.]** He cannot eat large meals or skip meals, and must eat a snack every few hours. **[ER 65.]** He must schedule each day's blood tests, medications and food intake. **[ER 89.]** He "sometimes become[s] weak and dizzy without warning," and only when he eats something do these sensations quickly subside. **[ER 90.]** If he fails to follow his diet regimen for more than a meal or two, his blood sugar rises to a level that aggravates his disease. **[ER 89.]** While Rohr and his wife "used to schedule frequent trips during vacation time to go to Rocky Point or to visit family in Utah," they no longer do so because it is increasingly difficult for him to follow his diet during travel. **[ER 90.]** Rohr stated that overall, "[c]ontrolling diabetes is like being on a chemical roller coaster."[6] **[ER 106.]**

**[5]** The district court oversimplified Rohr's condition when it opined that "if he stays on his medicines and watches what and when he eats the only limitation on his activities are the work-related restrictions recommended by his physicians." **[ER 124.]** While it may seem easy to take a pill or shot of

---

[6]Rohr's dietary regimen is consistent with that recommended by the American Diabetes Association for type 2 diabetics. Type 2 diabetics must carefully plan their meals because it is important for them to eat at the same time every day and ensure that they have the same proportion of fats, proteins and carbohydrates. *See* American Diabetes Association website, at www.diabetes.org. The complications of type 2 diabetes require immediate care and, if left untreated, can cause seizures and coma; they include high blood sugar (hyperglycemia), low blood sugar (hypoglycemia), increased ketones (which cause loss of appetite, nausea, vomiting, fever and stomach pain), heart and blood vessel disease, nerve damage, kidney damage, eye damage, foot damage, skin and mouth conditions, osteoporosis and Alzheimer's disease. *See id.* Any perception that only type 1 diabetes is "serious," while type 2 is not, is misplaced. Dr. Dippe testified in his deposition that both type 1 *and* type 2 diabetes can be "very serious." **[SER 16.]**

insulin, the reality of diabetes, a chronic and incurable disease, is not so simple. For people like Rohr, who must treat their diabetes with insulin, the failure to take insulin will result in severe problems and eventually death. *See* American Diabetes Association Position Statement: Insulin Administration, *Diabetes Care* 27:S106-107 (2004). Insulin injections themselves can be dangerous. Rohr stated in his deposition that it is difficult to determine how much insulin to take, as the necessary amount varies depending on the food and activity level. **[ER 47-49, 65.]** Generally, food raises blood glucose levels while exercise and insulin reduce them. But other factors play a role, too (*e.g.*, mental stress, illness and injury). To obtain the appropriate balance, Rohr must test his blood glucose levels through a finger stick test numerous times a day, and adjust insulin, food and activity level according to the results. **[ER 47-49, 65.]**

**[6]** If daily insulin injections alone more or less stabilized Rohr's blood sugar levels, such that any limitation imposed on his diet would be minor, then Rohr's major life activity of eating might not be substantially limited. *See, e.g.*, *Ingles v. Neiman Marcus Group*, 974 F. Supp. 996, 1001-02 (S.D. Tex. 1997) (holding that diabetic plaintiff who was merely required to maintain a "normal, good, healthy diet" was not substantially limited; plaintiff's condition was substantially controlled with oral medication, and he did not have to take insulin). However, Rohr has alleged substantial limitations on his eating in spite of his medicine and insulin. He must snack regularly, plan his daily schedule around his diet, avoid skipping meals and eat immediately when he feels dizzy or lightheaded. The general population does not have to "snack on something every few hours" to regulate sugar intake; moreover, the general population is not medically required to plan daily schedules around a dietary regimen. **[ER 65.]** Straying from a diet for more than one or two meals is not a cause for medical concern for most people, and skipping a meal, or eating a large one, does not expose them to the risk of fainting.[7]

---

[7]Salt River attempts to distinguish Rohr from the plaintiffs with type 1 diabetes in *Fraser* and *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923-

It is simply no answer to say that "*if* he strictly controls his diet" he is not substantially limited; for Rohr, the effort required to control his diet is itself substantially limiting.

[7] In short, Rohr has raised a genuine issue of material fact as to whether he is "significantly restricted as to the condition, manner or duration" in which he can eat, compared to the general population. *See Fraser*, 342 F.3d at 1038-40. Indeed, this court and others have found a sufficient showing of a substantial limitation on considerably less evidence than Rohr has presented. *See, e.g.*, *Head*, 413 F.3d at 1058; *Gonsalves v. J.F. Fredericks Tool Co., Inc.*, 964 F. Supp. 616, 621 (D. Conn. 1997) (plaintiff's statement that he had difficulty sleeping and eating was "sufficient to permit a finding that his diabetes substantially limited a major life activity."). Therefore, a genuine issue of fact exists as to whether Rohr has a disability, and summary judgment should not have been granted.

### 2.   The Americans with Disabilities Act Amendments Act of 2008

On September 25, 2008, two months after the parties' oral argument before this court, President George W. Bush signed into law the ADAAA, which significantly expands the scope of the term "disability" under the ADA. The ADAAA became effective on January 1, 2009, and Congress did not indicate that it may be applied retrospectively. Because we have reached our conclusions separate and apart from the ADAAA, we need not determine whether the amendment has retroac-

---

24 (7th Cir. 2001). Salt River claims that type 1 diabetes is harder to control than Rohr's type 2 diabetes. **[Appellee Br. 32-35.]** This argument is beside the point, since the substantial limitation inquiry focuses on the plaintiff's condition as compared to the general population, not other diabetics. *See Fraser*, 342 F.3d at 1040. Moreover, unlike some type 2 diabetics, Rohr must take insulin daily, and a failure to follow his strict diet regimen would endanger his health, like the type 1 diabetics in *Fraser* and *Lawson*.

tive effect. Nevertheless, because the ADAAA sheds light on Congress' original intent when it enacted the ADA, a brief discussion of the amendment is appropriate.

### a. ADAAA Calls for Broad Construction of "Disability"

The ADAAA explicitly rejects several Supreme Court decisions that defined "disability" more narrowly than many of the ADA's original Congressional proponents had intended. *See* H.R. Rep. No. 110-730, at 5 (2008) (H. Comm. on Educ. & Labor). Beginning in January 2009, "disability" was to be broadly construed and coverage will apply to the "maximum extent" permitted by the ADA and the ADAAA. 122 Stat. at 3553.

The ADAAA explains that "[w]hile [in enacting the ADA] Congress expected that the definition of disability under the ADA would be interpreted consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act of 1973, that expectation has not been fulfilled." Further, "the holdings of the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and its companion cases have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect." 122 Stat. at 3553.

### b. ADAAA Alters Supreme Court's Standards for "Disability"

The ADAAA clarifies Congress's intent with respect to the term "disability" in three major ways that could affect whether ADA protections are extended to persons with diabetes. First, the law makes clear that eating is a major life activity under the Act.[8] 122 Stat. at 3555. Second, the ADAAA

---

[8]We recognized in 2003 that eating qualifies as such a major life activity. *Fraser*, 342 F.3d at 1040.

states that the standard articulated in *Toyota*—that "substantially limits" means "prevents or severely restricts"—"has created an inappropriately high level of limitation necessary to obtain coverage under the ADA." 122 Stat. at 3554. In this respect, Congress has decided that the current EEOC regulations, which define the term "substantially limits" as "significantly restricted," require a greater degree of limitation than the 1990 Congress had intended, and has instructed the EEOC to revise its definition. *Id.*

**[8]** Third, and perhaps most significantly, the ADAAA rejects the requirement enunciated in *Sutton* that whether an impairment substantially limits a major life activity is to be determined with reference to mitigating measures. *Id.* The ADAAA makes explicit that the "substantially limits" inquiry "shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication, medical supplies, equipment, or appliances . . . ; use of assistive technology; reasonable accommodations or auxiliary aids or services; or learned behavioral or adaptive neurological modifications."[9] *Id.* at 3556. Impairments are to be evaluated in their *unmitigated* state, so that, for example, diabetes will be assessed in terms of its limitations on major life activities when the diabetic does *not* take insulin injections or medicine and does not require behavioral adaptations such as a strict diet.[10] *See* H.R. Rep. No. 110-730, at 8.

---

[9]The only excepted mitigating measures are ordinary eyeglasses or contact lenses, which must be considered in determining whether an impairment substantially limits a major life activity.

[10]The American Diabetes Association has heralded the ADAAA as "mak[ing] it clear that Congress intends for people with conditions such as diabetes to be covered by the law and protected from discrimination on the basis of their diabetes." American Diabetes Association, *Americans with Disabilities Act Amendments Act and Diabetes*, www.diabetes.org/advocacy-and-legalresources/discrimination/employment/americans-with-disabilities-act-amendments-act-and-diabetes.jsp#5.

**[9]** While we decide this case under the ADA, and not the ADAAA, the original congressional intent as expressed in the amendment bolsters our conclusions.

## B.    "Qualified Individual"

To state a claim of discrimination under the ADA, a plaintiff must establish that he or she is a "qualified individual." *See* 42 U.S.C. § 12112(a). The ADA defines a "qualified individual," in pertinent part, as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position . . . ." 42 U.S.C. § 12111(8). The individual must also "satisf[y] the requisite skill, experience, education and other job-related requirements of the position." *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (*en banc*). The district court concluded that Rohr was not qualified for his position as a welding metallurgy specialist because beginning in 2003 he did not obtain the required annual respirator certification. We disagree.

### 1.    Respirator Certification Test

Rohr argues that the respirator certification test was itself discriminatory. The ADA defines "discriminate," *inter alia*, as

> using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability . . . *unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity*.

42 U.S.C. § 12112(b)(6) (emphasis added).

It is undisputed that the respirator certification test "screen[ed] out" Rohr due to his high blood pressure, which was

a complication of his diabetes. The district court held, however, that the test was not discriminatory because it was "job-related" and "consistent with business necessity."

Once an employee shows that a qualification standard tends to screen out an individual with a disability, the employer shoulders the burden of proving that the challenged standard is job-related and consistent with business necessity. *See Bates*, 511 F.3d at 993.

Salt River asserts that its respirator certification test, including the breathilator test, was a business necessity because it is mandated by OSHA. However, OSHA's requirements are not so specific. OSHA obliges an employer to provide respirators "when such equipment is necessary to protect the health of the employee." 29 C.F.R. § 1910.134(a)(2). Further, the employer must establish and maintain a written "respiratory protection program" that includes, *inter alia*, "[m]edical evaluations of employees required to use respirators." 29 C.F.R. § 1910.134(c)(1)(ii). OSHA's regulations do not specify the content of such medical evaluations, how often the evaluations should be conducted, the appropriate tests for determining whether an employee should be certified, or any blood-pressure requirements.

**[10]** This is not a case where an employer merely implemented the medical certification program required by a federal agency. *Cf. Shields v. Robinson-Van Vuren Assocs.*, No. 98 Civ. 8785, 2000 WL 565191, at *1 (S.D.N.Y. May 8, 2000). Rather, OSHA's regulations were sufficiently broad to allow Salt River the discretion to determine how, and how often, it would evaluate its employees' ability to use a respirator. As such, there is a genuine issue of fact whether Salt River could have provided reasonable accommodations to enable Rohr to complete the test. Indeed, the ADA provides that "[t]he prohibition against discrimination . . . shall include medical examinations and inquiries." 42 U.S.C. § 12112(d).

**[11]** Salt River has failed to show the necessity of the particular breathilator test that it used in the evaluation, or the absence of any alternative respiratory evaluation appropriate for individuals with high blood pressure.[11] *See Bates,* 511 F.3d at 996. Salt River also failed to show that any such alternative method would impose an undue hardship. *See id.* Therefore, there is a genuine issue of material fact regarding all elements of the business necessity defense.

**[12]** Salt River also failed to show that the certification test was related to Rohr's job. "To show 'job-relatedness,' an employer must demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform the essential functions of the job." *Id.* at 996. Salt River has failed to show that Rohr carried a respirator, including when he was working in the field during an outage, or that respirators were readily accessible in the areas in which Rohr was assigned to work. Rohr disputes the relevance of the certification and argues that in twenty-three years as a welding specialist, he never had to use a respirator. As the respirator test would be job-related only if there was a possibility that Rohr would have to use a respirator, Salt River has not met its burden with respect to job-relatedness.

**[13]** Therefore, because Salt River has failed to show that the respirator certification test was job-related and a business necessity, and because the test tended to screen out an individual with diabetes-related high blood pressure, Salt River has not established that it is entitled to summary judgment. *See Bates*, 511 F.3d at 990 ("[I]t would make little sense to require an ADA plaintiff to show that he meets a qualification

---

[11]Rohr aptly notes that he might have been able to take the breathilator test at a different time of day or after medical treatment, when his blood pressure might have been lower, or he might have been able to take the breathilator test with medical supervision and informed consent even if his blood pressure exceeded Salt River's threshold. Salt River did not afford him any of these opportunities.

standard that he undisputedly *cannot* meet because of his disability and that forms the very basis of his discrimination challenge.").

### 2. "Essential Functions" of Rohr's Position

Apart from the respirator certification test, it is undisputed that Rohr met all of Salt River's qualification standards for a welding metallurgy specialist, a position Rohr held for more than twenty years. Whether Rohr was "qualified" for the position, therefore, turns on whether he could perform the essential functions of his position with or without reasonable accommodation. *See* 42 U.S.C. § 12111(8). Where there is "conflict in the evidence regarding the essential functions of [a position], we conclude that there is a factual dispute . . . , notwithstanding the job descriptions that [an employer] has prepared." *Cripe v. City of San Jose*, 261 F.3d 877, 888-89 (9th Cir. 2001); *see also Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 613 (3d Cir. 2006) (holding that whether an employee could perform the essential functions of a job with accommodations was a factual question for the jury).

**[14]** Rohr has raised a genuine issue of whether he could perform the "essential functions" of his position with accommodation. Essential functions are "fundamental job duties of the employment position . . . not including the marginal functions of the position." *See Bates*, 511 F.3d at 988 (quoting 29 C.F.R. § 1630.2(n)(1)). The ADA requires that in assessing a position's essential functions, "consideration shall be given to the employer's judgment as to what functions of a job are essential," including any written job descriptions prepared "before advertising or interviewing applicants for the job." 42 U.S.C. § 12111(8). Such evidence, however, is not conclusive: "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." *Cripe*, 261 F.3d at 887 (quotation marks omitted).

**[15]** Diabetes did not prevent Rohr from performing the bulk of his job, which, as described *supra*, was mostly office work. The disease did, however, prevent him from participating in out-of-town and overnight field assignments to repair outages. The parties dispute whether such field assignments were an "essential function" of his job, and Salt River's own medical staff stated that he was "physically able to perform the essential functions of his job with the accommodations as outlined."

**[16]** Therefore, drawing all inferences in favor of Rohr, as we must at this stage of the litigation, there is a genuine issue of fact as to whether Rohr was qualified for his position.

## III. CONCLUSION

The district court erred in granting summary judgment to Salt River. Rohr presented a genuine issue of material fact that his diabetes substantially limited his major life activity of eating and thus raised a genuine issue as to whether he was "disabled" within the meaning of the ADA. Rohr also raised a genuine issue as to whether he was "qualified" for his position within the meaning of the ADA, since with the exception of the respirator certification requirement, which may itself be found to be discriminatory, he provided sufficient evidence that he satisfied all of Salt River's job-related requirements and could perform the essential functions of his position.

The decision is vacated and remanded to the district court for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**