HELENE N. WHITE, Circuit Judge
(dissenting).
I dissent. Wolfe correctly asserts that to establish a prima facie case of disparate treatment he must show that 1) he is disabled or regarded as disabled, 2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation, 3) he suffered an adverse employment action, 4) U.S. Steel knew or had reason to know of his disability, and 5) the adverse employment action was taken because of his disability. See Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 452 (6th Cir.2004); Holiday v. City of Chattanooga, 206 F.3d 637, 642 (6th Cir.2000); Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1178 (6th Cir.1996), abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc., 681 F.3d 312 (6th Cir.2012) (en banc). Wolfe also correctly asserts that the ADA mandates an individualized inquiry in determining whether an employee’s disability disqualifies him from a particular position. To properly evaluate a job applicant, the employer must conduct an individualized inquiry into the impact, if any, the disability has on that individual’s ability to perform the essential functions of the job. See, e.g., Holiday, 206 F.3d at 642.
I agree with the district court that Wolfe presented sufficient evidence to survive summary judgment on the issue whether U.S. Steel regarded him as disabled. PID 1695-96. U.S. Steel rated Wolfe unable to work as a Utility Technician 2, a generic position involving multiple jobs.[1] U.S. Steel rated Wolfe unable to perform any position requiring average or *375 above average acuity. PID 504-05. And U.S. Steel rated Wolfe unable to operate or work within six feet of hazardous machinery. Hazardous machinery, according to U.S. Steel’s “Physical Rating Classification,” includes but is not limited to “cranes, mobile equipment, saws, conveyors, punch presses, rolling mills, remote control equipment and other machinery in mines or in the field.” PID 586.
One of Wolfe’s arguments below was that the hazardous-machinery restriction effectively disqualified him from any position on the plant floor. The district court properly concluded that a reasonable jury could infer as much from Wilkinson’s testimony. PID 1696. Wilkinson testified that during the summer of 2008, he held the position of Shift Manager of 3 Seamless Hot Mill operations at U.S. Steel’s Lorain facility, which entailed supervising approximately thirty Utility Technicians whose labor grades ranged from 1 to 5. PID 779-81, 798. Wilkinson testified that U.S. Steel’s Labor Relations department sought his input regarding Wolfe’s ability to work at the Lorain facility given Wolfe’s monocular vision:
Q. Do you ever recall an employee with, I guess, either a false eye or vision in only one eye who applied for a position in the summer of 2008?
A. I remember a conversation that we had with our labor relations department, asking us about the ability of someone to work within our environment.
Q. Okay. Tell me about that conversation. How did that come about?
A. You know, the conversation came about — obviously it sounds like they had an interview with someone, and this restriction came up, or disability ... They brought it to our attention and said would this be something that would be able to be accommodated within our facility?
They asked me a situation if they had an employee that had this disability, would there be an opportunity for them to work within this facility?
Q. Okay. And what did you tell them?
A. Obviously, I thought about it for a while. Looking at our jobs from the point of view that I have, I told them no.
Q. Okay. And you said looking at our jobs from the point of view that I have; can you elaborate on that a little bit? I mean, what was your thought process?
A. Sure.... [S]afety was the first and foremost, you know, opportunity that I looked at to see if that would put that person’s safety in jeopardy, or the other people in the area, as an industrial environment is challenging to work in.... From the quality standpoint would be the next one I always looked at, just to make sure that we’re putting a product out into the environment that obviously keeps us employed.... and then I just look at an overall, you know, look of our operations, and what’s the best fit for our business.
Q. Did you consider how having vision only in one eye would affect safety?
A. Absolutely.
Q. And how did you think it might affect safety?
A. You know, when you take a look at the jobs that people perform in the environment that we work in, having vision that would be blocked from one side or another, reaction time, things they would see or not see coming from one direction or another. You know, the ability to, you know, detect an employee that was in a position or not in a position, you know. Those are the key things that we take a look at.
Q. [ ] What made you think that having one eye would limit someone’s vision?
A. I guess, you know, from the standpoint that having the ability to not see *376 from one side or another. You know ... when I take an eye test, cover one eye up, and I have a hard time having my peripheral vision on the other side. So that’s kind of one of the things that I use as an example. So I cover this eye up, I have a hard time with my peripheral over here, because my other eye can only go so far.
Q. Was there anything else other than peripheral vision?
A. Just overall awareness ... I guess my assumption would have to swing their head back and forth to scan the entire area. So that reaction time may have a different effect on how they could react in an environment.
PID 799-80, 801-08, 805-06, 807 (emphasis added).
Wilkinson’s testimony, which was uncon-troverted, says what it says. U.S. Steel could have submitted evidence below that clarified or refuted Wilkinson’s testimony but did not. Nonetheless, the majority concludes that Wilkinson’s testimony does not support that U.S. Steel excluded Wolfe from a class of jobs or broad range of jobs in various classes, jettisoning our obligation to view the facts and inferences therefrom in Wolfe’s favor. Similarly, the majority incorrectly concludes that Wolfe put forth no evidence to suggest that U.S. Steel perceived monocular individuals as unable to perform a broad range of jobs.

Otherwise Qualified to Perform the Essential Functions of Utility Technician 2 With or Without Reasonable Accommodation

I also agree with the district court that Wolfe was “otherwise qualified” for the Utility Technician 2 position. The question is not whether Wilkinson’s or U.S. Steel’s assumptions regarding the effect of monocular vision on Wolfe’s capacity to perform are held in good faith; the question is whether Wolfe can do the essential functions of the job notwithstanding his monocular vision. Here, there was evidence that he could. As the district court observed, Wolfe’s experience in similar jobs “demonstrated that he would be qualified for the job were it not for U.S. Steel’s vision requirement.” PID 1697. Assuming that the business necessity defense is appropriate here,[2] U.S. Steel has the burden of showing that its vision requirement is a business necessity. PID 1699.
It may be a defense to a charge of discrimination ... that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out ... an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation.
42 U.S.C. § 12113(a). To show business necessity, a defendant must prove by a preponderance of the evidence that its qualifications standards are job-related for the position in question, consistent with business necessity, and cannot be met by a person with plaintiffs disability even with a reasonable accommodation. Hamlin v. Charter Twp. of Flint, 165 F.3d 426, 429 (6th Cir.1999) (“The ADA prohibits an employer from using qualification standards to deny employment ‘unless the standard ... is shown to be job-related for the position in question and is consistent with business necessity.’ ”) (quoting 42 U.S.C. § 12112(b)(6)); see also Atkins v. Salazar, 677 F.3d 667, 681 (5th Cir.2011). “To show job-relatedness, an employer must demonstrate that the qualification standard fairly and accurately measures the individual’s actual ability to perform the *377 essential functions of the job.” Bates v. United Parcel Service, Inc., 511 F.3d 974, 997 (9th Cir.2007) (en banc) (internal quotations omitted); see also H.R.Rep. No. 101-485(III), at 32 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 454-55 (“If a person with a disability applies for a job and meets all selection criteria except one that he ... cannot meet because' of a disability, the criterion must concern an essential, and not marginal, aspect of the job ... [and] be carefully tailored to measure the actual ability of a person to perform an essential function of the job.”).
U.S. Steel did not satisfy its burden of establishing a business-necessity defense; it made no showing that it applied a job-related qualification standard required by business necessity or that its visual acuity standards accurately measured Wolfe’s actual ability to perform the Utility Technician 2 position.
I would reverse the grant of summary judgment and remand for further proceedings.

. The Utility Technician 2 job description provides:
Operates equipment and performs tasks that support operations of the various producing units and works with materials and equipment to handle, transport and process product and materials. Directs the flow of material to and from producing units and inspects material. Operates equipment associated with producing units such as roll grinders, etc.[,] and operates material handling equipment such as overhead electric cranes, feeders, etc.[,j and operates material handling equipment such as overhead electric cranes, feeders, etc.[,] and mobile equipment such as tractors, trucks, heavy equipment, dozers, loaders, boom trucks, mobile cranes (various sizes and types), etc.[,] inspects and performs maintenance on all associated equipment.

. Wolfe asserts that his is a pure disparate treatment claim and that the business necessity defense applies only to disparate impact claims.